UNITED STATES of America,
Plaintiff–Appellee,

v.

Morgan M. FINLEY,
Defendant–Appellant.

No. 89–2929.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1990.

Decided May 28, 1991.

**838**

Ira H. Raphaelson, John F. Hartmann, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Susan G. Feibus, Louis B. Garippo, Lydon & Griffin, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Like *United States v. McClain*, 934 F.2d 822, also decided today, this prosecution grew out of Systematic Recovery Service's efforts to secure a contract to collect parking fees and penalties on behalf of Chicago. Morgan M. Finley, according to the indictment, used his position as Clerk of the Circuit Court of Cook County to extort money from SRS. Finley was convicted and sentenced to ten years' imprisonment for attempted extortion, violating the Hobbs Act, 18 U.S.C. § 1951, and operating the Circuit Court as a criminal enterprise, violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d). Part III of *McClain* rejects one of Finley's arguments—that the court should have allowed inquiry into the motives and state of mind of the principal informant, Michael Burnett. We assume familiarity with *McClain* and proceed to Finley's remaining objections.

During the years covered by this case, parking tickets were complaints initiating civil litigation in the Circuit Court of Cook County. Finley was that court's chief administrative officer. With more than 400 judges and 2,100 administrative employees, the Circuit Court is the largest judicial institution in the nation. Its Clerk is an elected officer, and political figures find this position attractive in light of the potential for patronage (the Clerk hires and fires most of the staff). Finley also played a role, if only as an adviser, in establishing procedures for dealing with the flux of tickets.

Michael Lambesis, a blackguard who was one of Finley's assistants, introduced him to Burnett, who had been hired by SRS to get the business by hook or crook. Burnett, unbeknownst to SRS and the "beneficiaries" of his largesse, had switched loyalties to the FBI. Burnett rewarded Lambesis handsomely for assistance in winning Finley's aid. In the end, the prosecutors emerged with damning audio and video tapes, one showing Finley accepting $7,500 from Burnett. Other tapes established (or allowed the jury to infer the existence of) other payoffs. Lambesis frequently told Burnett's tape recorder that Finley was on board and appreciated the cash. Finley argued that Lambesis pocketed Burnett's money and told tall tales, exaggerating both his influence and Finley's involvement. The jury saw Finley's role in a more sinister light.

■ As part of his effort to defend himself by depicting Lambesis as a scoundrel—more a bottom dweller than his own performance on tape revealed him to be—Finley tried to get before the jury a memorandum that William Martin prepared. Lambesis pleaded guilty, and Martin, his lawyer, sent him to James Mazepa, a psychotherapist. Mazepa prepared a report, which Martin used to seek a lower sentence. Mazepa's report relates that Lambesis described himself as a "liar and a bullshitter". Mazepa concluded that Lambesis took credit for events in which he

played no role and that Lambesis saw Burnett as a father figure, whom he tried to please. Finley wanted to use Martin's memorandum to impeach Lambesis. The district judge excluded the sentencing memorandum as hearsay, 1989 U.S.Dist. LEXIS 6175, which it is. Finley wanted to use Lambesis's statements for their truth—that he *is* a "liar and bullshitter" and therefore lied to Burnett—and wanted to use Dr. Mazepa's report similarly. The "liar and bullshitter" statement is double hearsay: Lambesis to Mazepa to Martin to court.

■ If Finley wanted Lambesis's self-description, he should have called him to the stand and asked. If he wanted Mazepa's diagnosis, he should have called Mazepa. Neither was called by any party. Lambesis's voice could be heard on audio tapes, his face appeared on video tapes, but his body did not appear in court. Impeachment was possible only by virtue of Fed.R.Evid. 806, and Part III of our opinion in *McClain* poses a formidable obstacle to Finley's argument. Let us assume, without deciding, that Rule 806 allowed Finley to impeach the verbal and video images of Lambesis. Still, that rule does not allow the use of evidence made inadmissible by some other rule. Rule 806 extends the privilege of impeaching the declarant of a hearsay statement but does not obliterate the rules of evidence that govern how impeachment is to proceed. It says the opposite—that counsel may use "any evidence which would be admissible ... if declarant had testified as a witness." Finley might have met the hearsay problem by employing Fed.R.Evid. 803(4), which specifies that statements made for the purpose of medical diagnosis are not hearsay. But Finley did not cite Rule 803(4) in the district court, and at oral argument in this court Finley's lawyer expressly disclaimed reliance on it.

Finley left Lambesis in the bullpen but did question John Goggin. Goggin, the associate clerk for operations, was called by the prosecution to explain how the Circuit Court handled parking ticket collections. Finley's lawyer tried to use Goggin as a character witness. His first question on cross-examination was: "In your opinion, was Morgan Finley an honest and dedicated public servant?" Goggin replied: "Yes, he was." This surprised the prosecutor. On re-direct examination the prosecutor reminded Goggin of an interview they had and asked:

Q. Do you recall answering [my question whether you had a positive opinion of Mr. Finley's honesty as a public official] by saying that "Mr. Finley stopped being a state senator because of an illegal bug by the Better Business Bureau being placed in a hotel room of a currency exchange lobbyist where Mr. Finley agreed to help vote on that bill but wanted a couple of currency exchanges as a quid pro quo, thereby embarrassing then Mayor Daley, resulting in Mr. Finley being removed as state senator."[†] Do you recall giving me that information as an answer?

A. That would—that was discussed, yes, sir.

Q. That was your answer wasn't it?

A. I—for the most part, yes.

Finley's objection was overruled. On re-cross Goggin explained that he had no personal knowledge of this incident, which Goggin asserted did not affect his opinion of Finley.

■ Character witnesses may be questioned about their knowledge of specific instances of prior misconduct. Fed.R.Evid. 405(a); *Michelson v. United States*, 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948). Finley's objection, and his later motion for a mistrial, were based on the rule that a lawyer may not cross-examine a witness by asking questions that lack a factual basis. *Michelson*, 335 U.S. at 481 & n. 18, 69 S.Ct. at 221 & n. 18; *United States v. Alvarez*, 860 F.2d 801, 828 (7th Cir.1988); *United States v. Lewis*, 482 F.2d

[†] The "Mayor Daley" in this question is Richard J. Daley, Mayor of Chicago from 1955 until his death in 1977. After Mayor Daley, in his role as chief slatemaker for the Democratic Party of Cook County, removed Finley from the ticket, the Mayor's son Richard M. Daley was elected to Finley's seat in the Illinois Senate. Richard M. Daley became Mayor of Chicago in 1989.

632, 639 (D.C.Cir.1973). The prosecutor could not have asked Goggin "Isn't it true that in the evenings Finley is a female impersonator who fleeces customers in seedy bars?" unless he had information to that effect. The answer "I've never heard anything of the sort", followed by a change of subject, leaves things dangling. Trials are not occasions for character assassination. According to Finley's lawyer, the prosecutor should have been compelled to prove that Finley indeed demanded currency exchanges as compensation for his legislative activities.

■ Yet the prosecutor did not ask Goggin whether he was aware that Finley *had* been removed from the ticket because Mayor Daley was embarrassed by Finley's attempted extortion. Instead the prosecutor's question was of the form: "Didn't you tell me that" something happened. The prosecutor had a factual basis for that question. Goggin had indeed told him this, admitted it on the stand. If the prosecutor had asked Goggin "Did you tell me that in the evenings Finley is a female impersonator who fleeces customers in seedy bars?", and Goggin had answered "Yes", there would be no occasion to require the prosecutor to trot out sources for this salacious dollop. *Goggin* would be that source. The need to inquire further arises only when the witness denies knowing about a nasty allegation. *United States v. Nixon*, 777 F.2d 958, 970 (5th Cir.1985). When dealing with character witnesses truth is a detail; the question is what the witness knows (or thinks he knows), which bears on both the defendant's reputation for honesty and the witness' credibility in assessing that reputation. Denial of a serious accusation, without follow-up, leaves an impression that may be unwarranted. Acknowledgement of the same charge does not leave the matter in the air, does not create a risk of unjustified inferences. Goggin conceded that he had told the prosecutor about the currency exchange incident. That obviated the need for further justification by the prosecutor. Finley was free to show—did show—that Goggin was relaying a rumor rather than a fact, and to rehabilitate the favorable character assess-

ment. Any further pursuit of this incident would have been a wild goose chase.

■ Finley's final contention is that ten years is too much imprisonment when compared with the treatment of co-defendants who pleaded guilty. Finley's crimes preceded November 1, 1987, the advent of the sentencing guidelines. Sentences for pre-guideline crimes lie in the discretion of district courts. *United States v. Nowicki*, 870 F.2d 405 (7th Cir.1989). Judges are entitled to decide that high public officials who extort money deserve sentences stiffer than those meet for underlings. Selling a pocketful of cocaine for a few thousand dollars can land one in prison for ten years without prospect of parole. Selling a public office that is responsible for overseeing 2,000 employees and collecting millions of dollars in fines annually is no less reprehensible—and Finley, unlike those sentenced under the guidelines, is eligible for parole.

AFFIRMED.