UNITED STATES of America,
Plaintiff–Appellee,

v.

Clarence McCLAIN,
Defendant–Appellant.

No. 89–3087.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1990.

Decided May 28, 1991.

As Amended June 19, 1991.

Michael J. Shepard, John F. Hartmann, Barry R. Elden, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Mark D. DeBofsky, DeBofsky & DeBofsky, Chicago, Ill., for defendant-appellant.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Appellant Clarence McClain was indicted, together with eight other defendants, as the result of a federal investigation into corruption in the award of a Chicago city contract. Only he and codefendant Morgan Finley chose not to plead guilty, and

they were tried together before a jury.[1] McClain was convicted of numerous federal offenses, from which he appeals on several grounds. We affirm in part and reverse and remand in part.

## I.

In 1983 the City of Chicago began to consider options for increasing city revenue. One of the methods discussed was changing its parking ticket collection system from an outdated and ineffective criminal system administered by the Cook County Circuit Court to a more expedient and successful administrative system, which would include hiring private collection agencies. Needless to say, obtaining the contract to collect the city's $600 million in overdue parking tickets was a lucrative prospect—so lucrative, in fact, that it attracted the attention of a private New York collection agency, Systematic Recovery Service (SRS). Setting its sights on the Chicago collection contract, SRS hired Michael Burnett, whose assignment was to "do whatever it takes" to win the contract. Tr. at 1081.

On arriving in Chicago, Burnett found and began collaborating with Clarence McClain, who, while holding no official position in city government, boasted colorfully of the power he wielded over city contract awards. Burnett needed this kind of influence, since SRS was challenged for the Chicago collection contract by Datacom, a competitor in the parking ticket collection business. Just as this collaboration with McClain was getting under way, however, Burnett's allegiance shifted dramatically. He was arrested in Nashville, Tennessee on federal firearms charges during the summer of 1984. To deflect these charges, Burnett informed the Federal Bureau of Investigation agents of the unfolding scheme in Chicago and agreed to continue participating in that scheme as a government informant. Thus, as SRS's parking ticket plan evolved, thousands of hours of conversations between Burnett and the indicted conspirators were recorded, forming the basis for this prosecution.

McClain's alleged involvement in the scheme consisted of several affirmative acts, as well as knowledge of, and acquiescence in, others. The government claimed that he had a hand in the development and submission of a detailed "Parking Study"—a report masquerading as an independent and impartial assessment of different cities' parking ticket collection practices, but in reality a contrived pitch for SRS and critique of Datacom, secretly funded by SRS itself. Apparently McClain also planned and participated in the bribing of John Adams, deputy director of Chicago's revenue department. Adams, who was indicted but pleaded guilty before trial, was to help SRS procure the parking ticket contract. McClain was further alleged to have cheated SRS out of $20,000 by fabricating a tip that Ira Edelson, the acting revenue director of Chicago, had been bribed by Datacom and must be bought back. We will note details of these and other matters as appropriate in the analysis of the defendant's claims on appeal.

For his participation in the overall scheme described above, McClain was charged with conspiring to violate RICO, 18 U.S.C. § 1962(d) (1988). The predicate acts listed in the RICO count included extortion. McClain was also charged with various counts of bribery and extortion under the Travel Act, id. § 1952(a)(1) and (3); attempted extortion under the Hobbs Act, id. § 1951; and using the mails in violation of the mail fraud statute, id. § 1341. He was further tried on the unrelated charges of making and filing a false tax return, 26 U.S.C. § 7206(1) (1988), and concealing assets in violation of the Internal Revenue Code, id. § 7206(4). In addition to the substantive acts that we have outlined, the jury was instructed, under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180,

1. Although McClain and Finley were codefendants at trial, they filed separate notices of appeal. The government's motion to consolidate was originally granted by this court, *United States v. Finley*, Nos. 89–2929, 89–3087 (7th Cir. March 2, 1990) (order consolidating appeals), but that order was subsequently vacated, *United States v. Finley*, Nos. 89–2929, 89–3087 (7th Cir. March 8, 1990) (order vacating March 2 order of consolidation).

90 L.Ed. 1489 (1946), that it could hold a conspirator liable for an offense committed by a coconspirator in furtherance of the conspiracy. The jury convicted the defendant of participating in the RICO conspiracy, three Travel Act violations, five Hobbs Act violations, the mail fraud count and the false tax return charge. The district court then sentenced McClain to an eight-year term of imprisonment for the RICO conspiracy, a five-year concurrent term of imprisonment for most of the other counts, and a five-year consecutive term of probation for one of the Travel Act counts. In this appeal, McClain alleges a number of errors in the district court's rulings and conduct of the case, but none directly relating to his RICO conspiracy conviction. We have grouped his claims by subject matter.

## II.

McClain was indicted on six counts of attempted extortion in violation of the Hobbs Act, five of which resulted in convictions. Each count charged that "Clarence McClain, defendant herein, attempted to commit extortion, as that term is used in [the Hobbs Act] ...," and went on to describe one of six specific incidents of alleged attempted extortion. The Hobbs Act penalizes "Whoever in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires so to do...." 18 U.S.C. § 1951(a) (1988). It goes on to define extortion as "the obtaining of property from another, with his consent, induced by wrongful use

of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). At trial, only McClain was charged with these particular six counts of attempted extortion. On appeal he raises two challenges to the five Hobbs Act convictions.

### A. *The* Pinkerton *Instruction*

Special verdict forms submitted to the jurors gave them four options for grounding a conviction of McClain on each count of attempted extortion: (1) under color of official right; (2) through wrongful use of fear of economic harm; (3) by aiding and abetting another; or (4) by being a member of a conspiracy when another member committed attempted extortion in furthering the conspiracy. The first two alternatives represent two means for carrying out attempted extortion based on the distinction drawn in the language of the act. *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.1987) (describing two prongs of Hobbs Act). On each of the five guilty verdicts, the jury checked only option (4): namely, that McClain conspired with another who attempted extortion. Interestingly, the jury was not instructed that the Hobbs Act itself prohibited conspiring to extort;[2] rather the only conspiracy instruction alleged to support these convictions was a *Pinkerton* instruction. Over defense counsels' objection,[3] the jury heard the following instruction: "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was commit-

---

**2.** The extortion instructions heard by the jurors stopped short of telling them that one could violate the Hobbs Act by conspiring to extort. "The federal statute alleged to have been violated in [the extortion counts] reads in part as follows: Whoever in any way or degree affects commerce or the movement of any article or commodity in commerce by extortion or attempts to do so is in violation of the statute." Tr. at 4907.

**3.** Tr. at 4076–79. Both defendants objected to the *Pinkerton* instruction during trial. At first the instruction was discussed by counsel and the district judge as if it were offered to facilitate the codefendants' conviction for the RICO conspiracy violation. *Id.* at 4076–77. When pressed by defense counsel as to whether combining a *Pinkerton* instruction with a RICO con-

spiracy charge would be permissible, the government apparently altered its strategy, claiming alternatively that the instruction was proper to allow the jury to convict Morgan Finley of the substantive acts of his alleged coconspirator, Michael Lambesis. *Id.* at 4078. *See infra* note 9 and accompanying text. Defense counsel clearly alerted the judge and prosecutors to the vagueness problem inherent in this proposed application of the *Pinkerton* instruction: "[Y]ou are going to have to get involved in explaining conspiracies with respect to non-conspiracy charges.... What does a jury know about conspiracy applying to non-conspiracy offenses? You are going to have to get involved in instructing the jury on that." Tr. at 4079.

ted and if the offense was committed in furtherance of or as a natural consequence of the conspiracy." Tr. at 4897.

McClain contends that the convictions were the result of a deficiency in the instructions, arguing under *United States v. Manzella*, 791 F.2d 1263, 1268 (7th Cir. 1986), that the *Pinkerton* instruction was far too vague and without reference to the specific complications of the jury's task in relation to particular charges.[4] *Manzella* involved a conviction for possession of cocaine with intent to distribute, as well as conspiracy to possess and distribute. On appeal, we determined that, while there was ample proof of a conspiracy to possess and distribute cocaine, "the greatest weakness in the government's case [was] the lack of evidence that Manzella possessed cocaine," 791 F.2d at 1266, leading us to question the substantive count. To save that conviction, the government gleaned from the record an instruction which it contended properly invoked the *Pinkerton* theory of liability.[5] We found the instruction lacking in the particularity required to explain *Pinkerton*'s vicarious liability:

The jury must be made to focus on the coconspirator's act, on whether it is a crime, on whether the coconspirator's guilt of this crime was proved beyond a reasonable doubt, and on whether it was committed in furtherance of the conspiracy in which the defendant participated.... [The instruction in this case] fails to present the *Pinkerton* doctrine in an intelligible form to the jury.

*Id.* at 1268. The defendant has a right to have his guilt determined by a jury, we concluded, not by an appellate court. *Id.* at 1269.

To apply *Manzella* to a given instruction, it is necessary to look not only at the *Pinkerton* instruction itself, but at the evidence supporting a particular charge and at the specific difficulties confronting a trier of fact in applying a *Pinkerton* theory to the evidence. Hence it is impossible to address a *Manzella* objection without some inquiry into the proof adduced at trial.[6] When application of coconspirator liability is straightforward, a simple *Pinkerton* instruction may suffice. Compare *United States v. Galiffa*, 734 F.2d 306 (7th Cir. 1984), discussed *infra*. But as the proof of

---

4. Believing that the conspiracy conviction had no adequate foundation in the indictment or instructions as tendered to the jury, McClain argued that in submitting the conspiracy theory the district court constructively amended the indictment. When the government responded that the judge had presented the *Pinkerton* rule as part of the introductory instructions, McClain replied that the *Pinkerton* instruction was too vague. Because the government knew from McClain's opening brief that it would have to defend the existence and the sufficiency of its *Pinkerton* instruction, it was adequately placed on notice of McClain's challenge to the instruction. Moreover, it would be unfair to hold McClain to the knowledge that the *Pinkerton* instruction might be applied to his Hobbs Act counts, given the government's statement to the district judge that the instruction would be needed for the RICO conspiracy count and for codefendant Finley's extortion charges. *See infra* note 3; *supra* note 9 and accompanying text.

5. The instruction in *Manzella* read:
    "If you find that the possession of the 1.041 grams of cocaine with intent to distribute was committed in furtherance of the conspiracy and that the defendant was a member of the conspiracy at the time the substantive offense was committed, then you are instructed that a co-conspirator committing an offense in fur-

therance of the conspiracy is the agent of the other conspirators."
791 F.2d at 1268 (quoting instruction).

6. In this appeal, McClain does not claim insufficient evidence, and we would be extremely reluctant to reach such an issue *sua sponte*. *United States v. Acosta*, 763 F.2d 671, 683 (5th Cir.) (after affirming one defendant's conviction on theory not presented at trial, court refuses to affirm conviction of codefendant in identical position because government did not argue new theory for codefendant on appeal, and court refused to raise it *sua sponte*), *cert. den. sub nom. Weempe v. United States*, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985); *see also Shlay v. Montgomery*, 802 F.2d 918, 924 n. 3 (7th Cir.1986) (court refused to review issue not raised in the briefs); *Mitchell v. Keith*, 752 F.2d 385, 391 n. 3 (9th Cir.) (court doubts sufficiency of evidence but refuses to review for party's failure to raise issue on appeal), *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985). But the defendant did allege instructional error, which in the case of a challenge to an instruction's specificity requires some review of the evidence. *Cf. United States v. Luis*, 835 F.2d 37, 41–42 (2d Cir.1987) (instruction's sufficiency supported by the "particularly reliable" proof presented on point). By failing to charge insufficient evidence, McClain has not waived his right to allege a related instructional error.

*Pinkerton* liability becomes more complex, the instruction must provide a higher degree of specificity if it is to survive *Manzella.* We therefore must inquire whether, *with respect to each of the counts of attempted extortion,* the jury was adequately informed of the sometimes complex law involved.

According to the allegations, McClain either attempted to extort or conspired with others who attempted extortion by accepting SRS money to pay for the parking study (Counts 12 and 13); channeling payment by SRS to John Adams (Count 14); coaxing $20,000 from SRS for McClain's personal benefit, on the pretense of buying Ira Edelson back from Datacom's stable (Count 15); and accepting payment from SRS for helping it to procure the parking contract (Count 16).[7] Through its responses on the special verdict forms, the jury indicated that it did not believe McClain himself attempted to commit any of the charged extortions under either prong of the Hobbs Act, but rather that others with whom McClain conspired committed these specified attempted extortions in furtherance of their conspiracy. In several of the instances, there are serious questions whether any coconspirator could have perpetrated the attempted extortion.

■ The theory that underlay the government's conspiracy charge in Count 14 was simple enough. John Adams was a public official, the deputy director of revenue for the City of Chicago. The payments from SRS to Adams, amounting to $10,000 in "loans," were in return for his help in securing for it the parking ticket contract; McClain helped plan this bribe and carry it out. The jury might easily enough have concluded that Adams, a public official who could act "under color of official right," extorted money from SRS in furtherance of the conspiracy. If the jury believed that McClain conspired with Adams in this scheme, it could convict McClain for *Pinkerton* liability on the substantive offense of attempted extortion. Due to its simplicity, Count 14 seems only to require a rather basic and uncomplicated *Pinkerton* instruction. Counts 12, 13, 15 and 16, on the other hand, involve legal subtleties that call into question the adequacy of the instruction on which these convictions depend.

■ Thus, with respect to SRS's supposed payment for the cost of the parking study in August 1984, five potential participants were involved. Besides McClain and Burnett, the only persons to have a connection to the two $5,000 payments described in Counts 12 and 13 were Michael Sandow (the unindicted President of SRS), Charles Knox and David Hammond (both attorneys who together undertook to assemble the study). Burnett was, of course, at all relevant times a government agent, and so was presumably incapable of participating in the conspiracy. *United States v. Lively,* 803 F.2d 1124, 1126 (11th Cir.1986). Michael Sandow was an officer of the victim company. Hence, while his participation in the extortion scheme was unclear, it was presumably impossible for him to be a perpetrator of extortion with whom McClain could have conspired. By the statute's very terms, a person from whom funds are extorted cannot be guilty of extortion as a principal. This leaves Knox and Hammond, both of whom were private citizens (and not public officials). Without resolving the question whether either of these two as a matter of law could, under the circumstances, commit extortion, it is

---

**7.** The indictment itself only related approximate dates and amounts of money involved in the alleged extortions, not the factual context of those charges. By comparing these dates and amounts with the trial record, we were able to determine the circumstances surrounding each of the five alleged extortions. Only one count gave us pause. Count 14 involved the attempt to extort $10,000 on or about September 28, 1984. From argument to the jury, it appears this amount might represent the final $10,000 of a total payment of $20,000 from SRS to McClain for production of the parking study report. (Counts 12 and 13 each involved $5,000 payment for the study.) We believe the attempted extortion described in Count 14 more likely referred to the payments to John Adams— $3,500 and $6,500 respectively—which took place in late September and October. These payments, presented to the jury without objection both in evidence and in argument by the prosecution, fit most closely with the allegations of Count 14.

difficult to find support in the evidence for such a conviction. Neither Knox nor Hammond were public officials, and the economic harm with which they might have threatened SRS is not apparent. Thus under Counts 12 and 13 we are unable to identify a coconspirator to whom attempted extortion may easily be ascribed.

According to Count 15, in late October of 1984, McClain played a trick on SRS, keeping for himself the $20,000 he convinced SRS was needed to pay off Ira Edelson. Only three parties could be implicated in this act: McClain, Burnett and Sandow. Again, Burnett could not, as an informant, conspire with anyone. Sandow remains an officer of the extorted company whose role was never that of extorter. The government did not allege or prove the involvement of Ira Edelson, whose name McClain apparently used only as a means of securing the payment. Therefore, as in Counts 12 and 13, there is no evident extorter in Count 15 with whom McClain could have conspired.

In Count 16, the government charged that McClain again reaped the benefits of his relationship with SRS when he received $5,000 from Michael Burnett for his continued services in January of 1985. Those persons potentially involved in the allegations of this count were again McClain, Burnett and Sandow. The same deficiency that affects Count 15 therefore applies to Count 16. There was apparently no extorter with whom McClain might have conspired, the jury verdict notwithstanding.

With this evidentiary background in mind, we can proceed to analyze the defendant's *Manzella* challenge. The brief instruction referenced by the government was among the first in a very long list read to the jury. This purported *Pinkerton* instruction appeared amidst the introductory instructions that set out the broad legal principles the jury was to follow. It said, simply, "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy." Tr. at 4897.[8] Given the complexity of superimposing a *Pinkerton* theory of liability on the facts of the four allegations of attempted extortion (Counts 12, 13, 15 and 16) that we have analyzed, we think that the capsulized form of the *Pinkerton* charge may have seriously oversimplified the jury's task. The much more detailed discussion of the government's burden on the attempted extortion counts against McClain—eleven transcript pages and twenty-six instructions later—made no reference to the *Pinkerton* theory of liability, much less focused the jury's attention on the specific predicates to *Pinkerton* liability. Tr. at 4908; *see also* Proposed Jury Instructions Submitted by the Government—Amended 6–8–89, nos. 27, 54m, *United States v. Finley*, 934 F.2d 837 (7th Cir.1990) (companion case) (bound pleading vol. 9 of 10). Indeed, these counts may have presented a stronger case for a particularized *Pinkerton* instruction than *Manzella*, which required proof of a far simpler crime and did not involve a government informant with whom conspiracy is legally impossible. Without more particular guidance with respect to Counts 12, 13, 15 and 16, the jury received too little direction, leaving it to find guilt without apparently adequate foundation.

It seems apparent the district court did not have McClain's attempted extortion counts particularly in mind in giving the *Pinkerton* instruction. The instruction conference makes plain that the court allowed the instruction for application to codefendant Finley's unrelated (but far clearer and simpler) extortion conspiracy, and that this may account for the absence of particularity in the instruction.[9] But the

---

**8.** The instruction appearing in part four of the special verdict forms was actually even shorter and less complete than that which was read to the jury: "The defendant was a member of the conspiracy when another member committed

attempted extortion in furtherance of the conspiracy."

**9.** In defending its request for the *Pinkerton* instruction, one prosecutor argued to the court:

jury was given the option of finding liability for McClain's attempted extortion on this basis, and it did in fact rely on a *Pinkerton* theory for assessing his liability. The instruction given was simply not adequate to carry the weight of liability for attempted extortion with respect to Counts 12, 13, 15 and 16, where various aspects of liability were unusual and complex.

The government cites to the contrary our earlier decision in *United States v. Galiffa*, 734 F.2d 306 (7th Cir.1984), in which we upheld a challenged *Pinkerton* instruction. But the instruction in *Galiffa*, which focused the jury's attention on the particular substantive crime at stake and stressed the government's burden in proving the elements of that crime, adequately informed the jury of its duty. *Id.* at 313. Additionally, Galiffa was tried together with at least four codefendants, one of whom was necessarily responsible for the substantive act if it occurred. Thus, because the trial in *Galiffa* clearly presented to the jury the other actors who might have committed the substantive crime, it was much easier for the jury to focus on the essentials of the substantive act, and the risk of erroneous determinations attributable to vague· or confusing instructions was greatly lessened. Here, in marked contrast, the instructions did not spell out the government's burden in establishing McClain's guilt of attempted extortion under a *Pinkerton* theory. The *Pinkerton* instruction was not linked to the crime of attempted extortion or its elements. In the case before us, the complex indictment, the ubiquity of the government informant and the absence of coconspirators standing trial required that the court explain specifically and in detail how the jury should apply *Pinkerton* to the facts before it if *Pinkerton* were to be the basis of liability with

respect to attempted extortion.[10]  *Cf. United States v. Zabic*, 745 F.2d 464, 474–75 (7th Cir.1984) (upholding particularized *Pinkerton* instruction). We must therefore reverse the convictions under Counts 12, 13, 15 and 16 because of the deficiency of the instruction as applied to those counts. We believe that Count 14 may be affirmed since application of vicarious liability in that count required far less specific and detailed instructions. It is evident that the requirements for a *Pinkerton* instruction vary depending on its application.

**B. Private Citizens and the Hobbs Act's "Official Right" Prong**

■ Extortion requires "obtaining of property ... by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1988). Clarence McClain was at all relevant times a private citizen, yet he was accused of attempting extortion using, among other means, "color of official right." By instructing the jury on this theory, the district court took one side in the debate that apparently simmers among this circuit's trial courts: can a private citizen ever be convicted of committing extortion through obtaining property "under the color of official right"? *Compare United States v. Freedman*, 562 F.Supp. 1378 (N.D.Ill.1983) ("official right" prong cannot apply to private citizens) *and United States v. Gonzales*, 620 F.Supp. 1143 (N.D.Ill.1985) (same) *with United States v. Phillips*, 586 F.Supp. 1118 (N.D.Ill.1984) ("official right" prong can apply to private defendant if victim reasonably believed defendant wielded governmental power).

We have in our cases drawn a clear distinction between extortion through threat or putting in fear and extortion "under color of official right." While the "fear"

And [the need for a *Pinkerton* instruction] applies clearly in this case to, for example, the extortion counts against the defendant Finley because the first two extortion counts are unquestionably built in part on Lambesis' participation. And so that being the case, the Government's theory is *Pinkerton* liability. Tr. at 4078.

**10.** We do not believe that the defendant can be faulted for failing to make more particularized

objections to the *Pinkerton* instruction here as applied to McClain's attempted extortions. This specific application was apparently not suggested at the instructions conference and, as outlined in note 3, *supra*, defense counsel did alert the court to the deficiencies of the proposed *Pinkerton* instructions as it might relate to various charged substantive offenses.

prong of the Hobbs Act applies only to cases in which an actual threat has been made (whether explicit or implicit), a defendant can commit extortion "under color of official right" if he merely accepts bribes, solicited or not. *Holzer,* 816 F.2d at 310. *Accord United States v. Davis,* 890 F.2d 1373 (7th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990); *United States v. Balzano,* 916 F.2d 1273 (7th Cir.1990). *Holzer* (where an implicit threat was found) involved a public official; nevertheless it is clear from our cases that extortion through fear can be committed by private persons. *See United States v. Burke,* 781 F.2d 1234, 1244 (7th Cir.1985); *United States v. Arambasich,* 597 F.2d 609, 610 (7th Cir.1979). Hence, the statute's language should be read to show Congress' understanding that a public official is in a position such that unsolicited bribes are indistinguishable from money received after threat of harm. But private persons, as a general rule, do not visibly wield the same power as public officials. Thus private citizens generally would encounter more difficulty in extorting property without threats. Usually a private person will have to make known to his victim his intent to injure, as well as his ability to carry out his intent, unless money or other benefit is forthcoming. In private person cases, therefore, prosecution under the fear prong is available, and the government may not ordinarily have a basis for resorting to the "official right" theory. Of course, our analysis does not apply, for example, to a private person actually masquerading as a public official, *cf. United States v. Rindone,* 631 F.2d 491, 495 (7th Cir.1980) (public official can extort money for permit beyond control of his office, so long as victim has a reasonable belief that he could affect issuance), nor does it grant private persons immunity from "official right" suits when they act in coordination with public officers, *see United States v. Margiotta,* 688 F.2d 108, 130–33 (2d Cir. 1982) (head of local Republican Party con-

victed for "official right" violation through 18 U.S.C. § 2(b), causing government official to violate Hobbs Act).

The argument against this view is that persons can maintain such a vise-like grip on power, even without office, that prosecution under the "official right" prong should be permissible. But despite this argument, we think the distinction earlier drawn is supported both by the statute and the history of enforcement under the Hobbs Act. Congress made this distinction clear in the plain wording of the statute, which sets off "under color of official right" from the other means of extortion. As we have previously noted, use of the disjunctive in its recital of extortionate conduct evinces Congress' intent to maintain the broad common-law definition of extortion when carried out by public officials. *United States v. Crowley,* 504 F.2d 992, 994–95 (7th Cir.1974); *cf. United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969) (describing in dictum trend in legislation to broaden common law extortion proscriptions to private persons who obtain property by means of force, fear or threats). Unlike at common law, statutory extortion through threats or putting in fear could be carried out by private persons or public officials, but extortion by bribery would remain illegal only for public officials. Nor does this construction render the clause "under color of" meaningless. No one has the right, guaranteed by any office he occupies, to extort money from others. Thus to prohibit extortion merely through "official right" would have been to outlaw the impossible and to provide a seamless but absurd defense for any official who merely claims he was acting beyond the scope of his official powers. The qualifier "under color of" was required for the statute to proscribe the intended conduct.[11]

Under the historical practice which bears this analysis out, "influence-peddling" has become a wide-spread (albeit not universally commended) art form at both the local

---

11. We are aware that "under color of" has been given a broader definition in constitutional inquiries under 42 U.S.C. section 1983. Given the criminal nature of the Hobbs Act, its legislative

history, and the distinction between its prohibitions and those of the Constitution, we think this narrower definition is warranted.

and national level. Lobbyists and ex-officials are sought out and paid to use their influence in the government to achieve their clients' ends. When these transactions are genuinely consensual (that is, free of intimidation or coercion), they are not challenged by the government as unethical or illegal. Yet, given the distinction we drew in *Holzer* between "fear" and "color of official right," an undue expansion of the "color of official right" concept might sweep so broadly as to implicate payments to influential lobbyists. For if consensual payment to a public official for use of his office constitutes a bribe, so too might consensual payment to an influential private lobbyist for use of her influence. And an attempt at a limiting principle—saving "official right" prosecutions only for private persons with a "vise-like grip" on public power (at least in the claimed pattern of a Clarence McClain)—might simply prohibit being too successful a lobbyist. Apparently the Supreme Court has some concern about extension of the Hobbs Act to heretofore legitimate lobbying or campaign activity. *See McCormick v. United States,* —— U.S. ——, ——, 111 S.Ct. 1807, 1816, 114 L.Ed.2d 307 (1991) ("Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.' ... To hold otherwise would open to prosecution ... conduct that has long been thought to be well within the law....."). Therefore we believe that, as a general matter and with caveats as suggested here, proceeding against private citizens on an "official right" theory is inappropriate under the literal and historical meaning of the Hobbs Act, irrespective of the actual "control" that citizen purports to maintain over governmental activity.

As we have pointed out, McClain was actually acquitted under the "official right" prong of the statute, the jury having concluded that he was guilty only on a conspiracy theory. Nevertheless, he challenges the "official right" charge by reshaping his claim of error into an evidentiary challenge, arguing that had he not stood indicted under the "official right" prong, much unfairly prejudicial evidence admitted at trial would have been excluded. Specifically, McClain points to the numerous conversations in which he boasted of the influence he wielded over public officials, even Mayor Washington himself. These statements, he argues, were admitted only to prove the predicate authority for an "official right" conviction under the government's impermissible charge. As such, the statements were irrelevant for any proper purpose, and the prejudice that resulted from their admission constituted reversible error.

McClain faces a heavy burden in challenging the admission of his statements. Evidentiary decisions are for the trial judge, and we will not disturb them unless she has abused her discretion. *United States v. Briscoe,* 896 F.2d 1476, 1489–90 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). But even without this deference, we would agree with the trial judge's determination. Although we believe it improper to have charged McClain under the official right prong of the Hobbs Act, McClain points to nothing in the record which supports the claim that these statements were admitted only for proving his guilt under that prong. We agree with the government that the statements also supported another extortion theory it offered to the jury, extortion by putting in fear—specifically in this case, "fear of economic harm." *See, e.g., Balzano,* 916 F.2d at 1285–86 (fear of economic harm sufficient to support Hobbs Act conviction); *Holzer,* 816 F.2d at 309–10 (same). Of course, even private citizens can be subject to suit under the "fear" prong of the Hobbs Act. *Burke,* 781 F.2d at 1244. Whatever the evidence might eventually show, McClain could have committed attempted extortion had he suggested to SRS that he could prevent its receipt of the

contract unless it paid him.[12] Touting his own ability to control city government would be a necessary step for McClain in making this threat. Because these statements were admissible as relevant to a separate theory legitimately offered in the extortion counts, the propriety of the charge against McClain of attempting extortion through "color of official right" is not before us.

### III.

■ McClain next levels a series of objections at evidentiary rulings made by the district court. Again, we review these decisions mindful of the appropriately deferential standard. *Briscoe*, 896 F.2d at 1490. First to be challenged is the court's decision to restrict the defense's questioning of Michael Burnett. Burnett's statements permeated the tapes that implicated McClain, not surprisingly because he was SRS's agent in charge of recruiting help to secure the parking ticket contract. The government decided not to call Burnett as a witness. Instead, it offered only Burnett's taped statements during conversations with McClain, and the court added a limiting instruction that the jury consider these statements only for the context they provided—"Statements by Michael Burnett on these tapes and in conversation are what the law calls hearsay.... The statements are only relevant as to what the listener says, does, or believes in response to them." Tr. at 1881. While the district judge allowed the defendant to call Burnett as a witness and inquire into the circumstances surrounding the operation, she denied McClain the right to impeach Burnett, except insofar as Burnett's specific testimony might contradict prior statements, and then only to allow McClain to introduce those prior inconsistent statements. Given these restrictions, McClain decided against calling the informant. McClain complains that denying him the opportunity to impeach Burnett violated his sixth amendment right to confront the witnesses against him and conflicted with Federal Rules of Evidence 607 and 806.

A claim on all fours with McClain's sixth amendment claim has previously been rejected by this court in *United States v. Davis*, 890 F.2d 1373, 1379–80, a case not only analogous to this one but arising from the same corruption scandal. Davis, a Chicago alderman who allegedly accepted SRS bribes for helping secure the same parking contract, likewise protested that his sixth amendment rights were abridged when the judge refused him the right to impeach Burnett on cross. As in this case, Burnett was never called by the government, but his statements saturated the taped conversations with Davis. We held in *Davis* that the same limiting instruction as given here eliminated Burnett as a "witness" against the defendant. Hence no sixth amendment right to cross-examine applied.

■ Neither Rule 607 nor 806 affords any comfort to the defendant here. Rule 607 allows impeachment of a *witness*. Just as Burnett was not a witness for sixth amendment purposes, he was likewise not a witness for Rule 607 impeachment. Defendant argues that he would have called Burnett as a witness, but the trial judge correctly decided that questioning Burnett solely to impeach him would be irrelevant; because Burnett's comments on the tapes did not present testimony damaging to the defendant, the witness' character was not in issue. The trial judge did give McClain the right to call Burnett for questioning regarding the taped conversations and even the right to impeach the informant with specific prior inconsistent statements should such contradictions in the testimony

---

**12.** On appeal, defendant contends that he cannot be convicted for extortion through fear if he merely threatened not to use his influence to help SRS acquire the parking ticket contract. He cites *United States v. Garcia*, 907 F.2d 380 (2d Cir.1990), which held that a congressman could not be convicted of extortion under the "fear of economic harm" prong of the Hobbs Act if he merely offered to help the contractor acquire lucrative contracts. The Second Circuit reasoned that Wedtech had no legal entitlement to the contracts, and was not impeded from simply applying for the contracts itself. *Garcia* is not inconsistent with our opinion; consonant with the indictment, it was possible McClain might have committed extortion had he threatened actually to impede SRS's bid for the parking ticket contract.

appear. But she was correct in denying the defendant's request to impeach Burnett on collateral matters, given that his comments on the taped conversations were not admissible for their truth.

Rule 806 provides a means of attacking a declarant's credibility. It provides for impeachment of a hearsay declarant, or a declarant whose non-hearsay statement came in under Rule 801(d)(2)(C), (D) or (E). Burnett's statements were not hearsay, for they were not admitted for the truth of their assertions. McClain must therefore argue that the statements constituted an admission by a party opponent specified in one of the three subheadings of 801(d)(2). Defendant's theory under Rule 806 appears premised on the belief that Burnett's statements were used by the jury as "adoptive statements," statements made by another but adopted by the party as its own. Not only do we disagree with the predicate for this argument (since the trial judge admitted the statements to provide context only), the conclusion is also incorrect. Rule 806 says nothing of 801(d)(2)(B), which governs non-hearsay statements adopted by the party against its interest. McClain offers no other reason in his brief for impeachment under 806, and we therefore will accept the trial judge's exercise of discretion.

McClain next challenges the admission of certain tapes for the purpose of impeaching him. While the defendant did not take the stand, he did offer tapes of exculpatory statements he made, indicating he accepted only legitimate consulting fees from SRS. Over the government's objection, McClain insisted that these statements be admitted for their truth. In its rebuttal case, the government then tried to impeach McClain's credibility, offering prior expansively exculpatory statements he made in public, which seemed to have been thoroughly deflated by the evidence presented at trial. McClain alleges error in the admission of these taped statements on both evidentiary and constitutional grounds.

In *United States v. Noble*, 754 F.2d 1324, 1330–32 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985), this court held that the government may impeach even a non-testifying defendant if that defendant offers past exculpatory statements into evidence. The defendant in *Noble* offered a taped conversation with a government informant, in which he denied knowledge of any counterfeiting operations. The government then offered, to impeach the defendant, a record of his prior conviction for counterfeiting. We found that the conviction was properly admitted through Rule 806 under Rule 609(a)(2). The case now before us is different, in that the government used Rule 806 to impeach the hearsay declarant with a prior statement under Rule 613.[13] This distinction does not render the trial judge's decision in this case an abuse of her discretion. Rule 806 applies to Rule 613 impeachment as surely as it does to impeachment under Rule 609. The defendant's assertion that he must receive a chance to explain the impeaching statements, and that this would require him to give up his fifth amendment right not to testify, is rebutted easily by the plain language of Rule 806: "Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." Fed.R.Evid. 806. Moreover, we do not think the fact that the challenged evidence involved statements—arguably closer to bearing "witness against oneself" than past conduct or convictions— runs afoul of fifth amendment restrictions. When a defendant takes the stand, he is generally subject to the same impeachment methods as other witnesses, including the use of prior statements. The defendant should not be able to avoid completely this legitimate attack by, instead of testifying, presenting only exculpatory statements

13. The defendant argues in his brief that *Noble* is distinguishable because the trial judge there admonished the jury that the government's rebuttal evidence was for impeachment only. The defendant never requested such a limiting instruction in this case, however, and while one might be required if sought, we do not think its absence constitutes plain error.

made in the past. We therefore believe that prior recorded statements may be admitted for impeachment of a non-testifying defendant, after the defendant opens the door with prior exculpatory statements, without violating either the Federal Rules of Evidence or the Constitution.

■ McClain's other evidentiary challenges arise in the tax case against him. One source of inaccuracy on McClain's 1984 return, according to the government, was a deduction taken for gas bills he never actually paid. The defendant stopped payment on two checks to People's Gas on account of the unpaid bills for two buildings he owned. McClain defended against the tax charge by arguing that his violation was not "willful"—he simply forgot that he had stopped payment on those checks. As part of its false tax return case, the government offered evidence that a representative of the gas company found illegal, unmetered gas taps leading from the company's gas lines into McClain's buildings and disconnected them. Tr. at 2240–49. McClain asserts that this proffer constituted inadmissible evidence of past crimes, wrongs or acts under Rule 404(b).

Defendant objected at the time the gas tap evidence was offered, but the district court allowed the evidence to be admitted. The government's explanation both to the trial judge and on appeal is that it did not introduce the evidence to prove that McClain connected the illegal taps; to the contrary, the government specifically elicited testimony that its witness had not drawn this conclusion. Rather, the government asserts that this evidence was relevant to show McClain's intent in filing the false tax return (a purpose which would meet the objection under Rule 404). The government's reasoning runs as follows: because the taps were funneling free gas into McClain's buildings, there is a logical inference that he knew he was receiving it; because he stopped payment on his checks "shortly after" the illegal taps were discovered and dismantled, there is a further logical inference that the two events are causally related; and, finally, because the act of stopping payments was in retaliation

for disconnection of the taps, the chances are greater that McClain would recall stopping payment at tax return time.

We must confess some skepticism at this string of inferences, especially the second step. Even assuming McClain knew of the taps and their discovery, why would the interruption of free gas necessarily goad McClain into canceling payment for the gas legitimately received and billed? McClain had apparently been willing to pay for this billed gas all along; because stopping payment is such a speculative response to the discovery of the taps, the causal connection drawn by the government is dubious. Thus there are plausible grounds for believing that the evidence was introduced partly in hopes of damaging McClain's character. Nevertheless, the trial judge accepted the government's explanation of its proffer, and because she treated the evidence as proof of intent, her inquiry invoked only the relevancy/prejudice balance of Rule 403 (rather than the Rule 404 test for proof of prior conduct).

Weighing relevancy against unfair prejudice is peculiarly within the province of the trial judge. *United States v. Degaglia,* 913 F.2d 372, 375 (7th Cir.1990); *United States v. McNeese,* 901 F.2d 585, 598 (7th Cir.1990). But even if we were to find any abuse of discretion in this balancing, or in finding no violation under Rule 404, any prejudice that might have resulted from the admission of this evidence was doubtless harmless. Far more critical to the government's tax case than the stopped checks was the failure to report thousands of dollars in payments from SRS. And when one considers the degree to which McClain's character was impugned by the numerous tapes depicting his insidious dealings with SRS, the illegal gas taps, even if attributed to McClain, surely paled in comparison.

The second challenge to the district court's evidentiary tax rulings merits little discussion. In response to the charge that McClain had failed to report the $20,000 received from SRS in October or November of 1984, the defendant wanted admitted into evidence his 1985 tax return, on which

he included the $20,000 sum in his income. The district court ruled *in limine* that the 1985 return was not probative of McClain's state of mind at the time he filed his 1984 tax return, given the indictment filed against him in the intervening year. We see no reason to upset this ruling. McClain's proffered basis for offering the 1985 return is nonsensical. In his brief, he first claims the $20,000 represented "reimbursement for expenses incurred on behalf of SRS," but goes on to justify reporting the amount sixteen months later "when [the income] could be matched against expenses." Appellant's Br. at 56. Judge Rovner was correct to refuse this proffer.

## IV.

In addition to RICO conspiracy, extortion and false tax return convictions, McClain was tried and convicted for violating the mail fraud statute, 18 U.S.C. § 1341 (1988). On appeal he argues that this conviction must be overturned because jurisdiction was improper and the mailing element was inadequate. In scheming to submit a fraudulent parking study to the City of Chicago, one which would tout SRS without revealing its sponsorship of the study, McClain, Knox and Hammond decided that the study's credibility would be enhanced if the study's authors possessed appropriate credentials. Therefore, Knox and Hammond went about applying to the "Institutional and Municipal Parking Congress" (IMPC) in Fredericksburg, Virginia, a body whose membership requirements are apparently satisfied by completion of its application and enclosure of the membership fee. After filling out the application, the two turned it over to Burnett, who in turn gave it to FBI agent Dunn, who mailed it to Virginia.

But something happened between the return of their new parking credentials and Knox and Hammond's subsequent submission of the study that convinced them this accolade did not belong in their document. Perhaps the two realized the worthlessness of the membership, available to anyone with one hundred ninety dollars and a completed application; perhaps they balked

when they realized their coconspirator had used the U.S. mail, elevating their fraud to a federal offense. In any event the document, as it was received by the City of Chicago, made no mention of any membership in the IMPC.

This absence suggests a fundamental defect in the mail fraud conviction, namely the relationship of the mailing to the fraudulent scheme. "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). Even under the lenient test established by *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 1447–50, 103 L.Ed.2d 734 (1989), the mailing before us cannot be said to have furthered the fraud attempted by the conspirators. Although Knox and Hammond apparently believed at one point that IMPC membership would enhance their credibility, they must have changed their mind: no indication of these credentials appears on the study itself.

The problem presented by this case differs from the issue common to the line of Supreme Court cases discussed in *Schmuck.* In each of those cases, and in *Schmuck* itself, the adequacy of the mailings was questioned because the schemes had arguably reached fruition before the mailings took place. In our case, the mailing was to serve some antecedent purpose in the fraudulent scheme, but that prior purpose was apparently abandoned before it even impacted on the scheme. While at the time of the mailing, the defendant believed the credentials would be used to facilitate the fraud, we do not believe that an earlier and apparently abandoned intent is sufficient. Whatever may have been the original purpose of the mailings, if their subject was never used in furtherance of the scheme, they cannot properly serve as predicates to a mail fraud conviction.

In answering this question as we do, we leave unresolved another issue raised by the defendant on appeal. The mailing on

which this conviction rests was carried out not by the defendant or a coconspirator but by an FBI agent. The defendant's challenge thus goes beyond the often-raised complaint of manufactured jurisdiction, *cf. United States v. Anderson*, 809 F.2d 1281, 1287–88 (7th Cir.1987); *United States v. Archer*, 486 F.2d 670, 681–82 (2d Cir.1973), and questions whether there was sufficient evidence of an element of the crime itself, *Schmuck*, 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989).

### V.

Finally, McClain challenges the length of sentence imposed for his false tax return conviction. On Count 22, filing false tax returns, the district court apparently sentenced the defendant to a five-year term of imprisonment, to run concurrently with his eight-year prison sentence for the RICO conspiracy conviction. The government concedes on appeal that the maximum sentence allowed under 26 U.S.C. § 7206 (1988) is three years. Since the issue is not contested, we direct that the district court, on remand, resentence the defendant based on the proper three-year limitation. 18 U.S.C. § 3742(f)(1) (1988).

### VI.

McClain's convictions on Count 1 (conspiring to violate RICO) and Counts 4, 5 and 7 (Travel Act) are AFFIRMED. The conviction on Count 14 (Hobbs Act) is AFFIRMED. The conviction on Count 22 (filing false tax return) is AFFIRMED, but we remand for resentencing. The convictions for Counts 12, 13, 15 and 16 (Hobbs Act) and Count 24 (mail fraud) are REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

EASTERBROOK, Circuit Judge, concurring.

The prosecutor charged McClain with violating the Hobbs Act by extorting money "under color of official right". The jury acquitted him. Whether a private person can violate the Hobbs Act in the way this indictment alleged is irrelevant to the jury's verdict on other counts, to the sentence, and to the disposition of this appeal. I therefore do not join Part II.B of the opinion, although I join the remainder of the opinion and the judgment.

My colleagues do not pretend that their discussion of the Hobbs Act plays any role in explaining the outcome of this appeal. They seek to clarify the law rather than support a judgment. I favor clear and simple rules, but under Article III of the Constitution our authority to announce rules depends on the presence of a concrete controversy. There is none between these parties about the proper reading of the Hobbs Act. Other defendants are at loggerheads with the United States on this question; district judges disagree about the subject; but so far as McClain is concerned, this opinion is advisory. His interests are no more at stake than they would have been had the prosecutor dismissed this charge before trial.

We cannot settle the scope of the Hobbs Act; only Congress or the Supreme Court can do so. Today's discussion will not precipitate a decision by either body. The majority's analysis, being unrelated to the judgment, is also unreviewable. Dicta sometimes point the way to an inevitable outcome or adduce new arguments for the consideration of other courts. We do neither. Arguments are balanced; two of my colleagues choose sides.

Cert-proof essays leave the "losing" party, unable to obtain review from a higher tribunal, behind the eight ball. Until we produce a decision in a form subject to review by our superiors, we are just stirring the pot. The Department of Justice will continue to frame indictments in these terms; judges will continue to ponder the arguments rehearsed in the majority's opinion; panels of this court will consider it their duty to examine the subject anew when finally seized of a concrete controversy. Perhaps the prosecutor will reformulate the charge under 18 U.S.C. § 2, as in *United States v. Margiotta*, 688 F.2d 108, 130–33 (2d Cir.1982), and we will have to review the question from that perspective.

One way or the other, the final decision lies ahead.