**UNITED STATES COURT OF APPEAL**

**FIFTH CIRCUIT**

_____

No. 93-8679

_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

DARRELL A. TOMBLIN,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(February 24, 1995)
ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

(Opinion December 30, 5th Cir., 1994, _____F.3d_____)


Before REYNALDO G. GARZA, WIENER, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Tomblin's Petition for Rehearing by Panel is DENIED; and no member of this panel nor judge in active service on the Court having requested that the Court be polled on rehearing en banc, the Suggestion for Rehearing En Banc is also DENIED. However, we withdraw our prior opinion, *United States v. Tomblin*, 42 F.3d 263 (5th Cir. 1994), and substitute the following:

Darrell A. Tomblin was convicted of bribery (Count 22),

conspiracy to commit bribery (Count 1), using interstate travel to facilitate bribery (Counts 2, 4, 6-8, 10-21), aiding and abetting bribery (Counts 5, 9), and extortion (Count 3).  He appeals on various grounds.  We affirm in part and vacate in part.

I

Tomblin was the coordinating force for a group attempting to develop business opportunities in Grenada and acquire controlling interests in approximately ten failed or failing savings and loan institutions ("S&Ls").  Tomblin believed that United States Senator Jacob "Chic" Hecht of Nevada, whom he had known for several years, would be helpful and interested in these projects due to his position as a member of the Senate Banking and Intelligence Committees.

Because Tomblin lacked the financial assets to forward these plans, he involved two Texas bankers, Leo Ladoucer and Danny Gonzalez, as potential financiers for the ventures.  To secure their cooperation in his plans, Tomblin promised Ladoucer and Gonzalez that he would exercise his political influence with Senator Hecht's office to gain assistance in bypassing the regular channels involved in obtaining the approval of the Federal Home Loan Bank Board ("FHLBB") for their takeover of Suburban Savings Association ("Suburban").

Tomblin, Ladoucer, and Gonzalez attempted to accomplish their goals, however, by promising Glen Mauldin, Senator Hecht's administrative assistant and campaign treasurer, a $50,000 campaign

contribution, paying Mauldin's expenses for a trip to Texas, and promising him a 10% stake in the Grenadan and S&L ventures. Unbeknownst to Tomblin, Ladoucer and Gonzalez served as government informants and made several recordings of conversations relating to these events.

The involvements of the parties began when Tomblin contacted Mauldin to determine what assistance the Senator's office could provide for the Grenadan business ventures. Mauldin introduced Tomblin to Vincent Lachelli, a Washington, D.C. lobbyist with Grenadan connections,[1] and at a subsequent meeting, Tomblin offered Mauldin ten percent of the stock in the corporation being set up for the Grenadan venture.[2]

Shortly thereafter, George Chall, who was acquainted with Tomblin, introduced Ladoucer to Tomblin. Ladoucer and Gonzalez were seeking investors to buy notes from Suburban in order to improve Suburban's liquidity. Tomblin did not buy any notes; instead, he suggested that Ladoucer and Gonzalez should obtain a waiver from the FHLBB so that they could make more loans.[3] Tomblin offered to use his influence with Senator Hecht to facilitate a meeting between Ladoucer, Gonzalez, and Danny Wall, chairman of the

---

[1] Lachelli exercised his connections to obtain letters from U.S. officials to the Prime Minister of Grenada and meetings with Grenadan officials when the group eventually went there.

[2] At trial, Mauldin testified that Tomblin said, "he was reserving ten percent of the stock for someone they could work with, and then he indicated to me at that time that it was `for you and Chic.'" Lachelli also testified that ten percent had been set aside for Mauldin.

[3] This waiver is commonly referred to as "forbearance."

FHLBB.[4]

Ladoucer and Gonzalez also desired access to Chairman Wall because of the manner in which they had acquired a substantial interest in Suburban.[5] The Texas Savings and Loan Department had notified Ladoucer and Gonzalez that they could not exercise the control they had acquired until they received approval for the change of control from the FHLBB. Because their acquisition of Suburban stock had been illegal, their application for control would not survive a regular review by the FHLBB. Absent approval by the FHLBB, their one-million-dollar investment in Suburban was substantially at risk. Consequently, Ladoucer and Gonzalez wanted the meeting with Chairman Wall to see if they could bypass the usual review.

Tomblin promised to help Ladoucer and Gonzalez get a meeting with Chairman Wall, subject to several conditions. First, Ladoucer and Gonzalez had either to pay Tomblin a $100,000 fee for his assistance or make him a $250,000 loan. Tomblin also told Ladoucer and Gonzales that they would have to pay Lachelli a $25,000 lobbying fee and contribute $50,000 to Hecht's campaign fund. Tomblin had Mauldin fly to San Antonio to discuss the planned

---

[4] The Senate Banking Committee, of which Hecht was a prominent member, oversees the FHLBB.

[5] Ladoucer and Gonzalez had used fraudulent real estate transactions to acquire the stock. As a result of these transactions, Ladoucer was indicted for bank fraud, and eventually pled guilty to several charges; he also agreed to cooperate with the government in its investigation of the conspiracy at issue in this case. Gonzalez likewise was indicted, pled guilty to two counts of bank fraud, and agreed to cooperate in the investigation of this case.

4

meeting with Chairman Wall and the arrangements for the campaign contribution.

Ladoucer and Gonzalez complied with most of Tomblin's requests. They paid Mauldin's expenses of $725.15 for the trip, made the $250,000 loan to Tomblin through two Texas shell corporations, and paid Lachelli the $25,000 lobbying fee. In exchange, Tomblin arranged the meeting with Chairman Wall.

At the meeting with Chairman Wall and his assistant, Ray Meyer, Gonzalez discussed the change of control and their hope that the FHLBB would grant forbearance to Suburban. Mauldin also attended the meeting; Meyer testified at trial that Mauldin's attendance was unusual and an indication of Hecht's interest.[6]

None of the planned ventures ever came to fruition. The FHLBB questioned the application for change of control, and Meyer's cooperation was at best lukewarm. Ladoucer also never made the $50,000 campaign contribution. Although the group continued to pursue the Grenadan venture, indictments against the conspirators short-circuited their plans.[7]

Tomblin was charged with twenty-two counts of conspiracy to

---

[6] According to Meyer, "it was a rare situation when you had one of their assistants come over."

[7] Mauldin eventually pled guilty to conspiracy to commit bribery. He admitted that he had accepted the $725.15 as a bribe, and that he had agreed to accept ten percent in the ventures in return for his assistance with Chairman Wall and the FHLBB. Lachelli also pled guilty to conspiracy.

commit bribery,[8] bribery,[9] using interstate facilities to commit

---

[8]    Section 371 of Title 18 makes it unlawful when "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, . . . and one or more of such persons do[es] any act to effect the object of the conspiracy."  18 U.S.C. § 371 (1988).

[9]    Section 201 of Title 18 makes it unlawful to:
(b)    (1)    directly or indirectly, corruptly give[], offer[] or promise[] anything of value to any public official or person who has been selected to be a public official, or offer[] or promise[] any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent))
        (A)    to influence any official act; or
        (B)    to influence such public official or person who has been selected to be a public official to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
        (C)    to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person, or
    (2) . . . [if a public official or a person selected to be a public official,] directly or indirectly, corruptly ask[], demand[], exact[], solicit[], seek[], accept[], receive[], or agree[] to receive anything of value for himself or for any other person or entity, in return for:
        (A)    being influenced in his performance of any official act; or
        (B)    being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
        (C)    being induced to do or omit to do any act in violation of the official duty of such official or person.
(c)(1) otherwise than as provided by law for the proper discharge of official duty))
        (A)    directly or indirectly give[], offer[], or promise[] anything of value to a public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official; or
        (B)    being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demand[], seek[], receive[], accept[], or agree[] to receive

bribery,[10] aiding and abetting bribery,[11] and extortion.[12]  After a two-week trial that included thirty-five recordings of conversations in which Tomblin had participated and testimony from multiple witnesses including Tomblin himself, Tomblin was convicted on all counts.  The district court sentenced him to $5,000 restitution, fifty-one months' imprisonment, and three years of supervised release.  Tomblin appeals his convictions and sentence, arguing that 1) the district court should have suppressed the

---

or accept anything of value personally for or because of any official act performed or to be performed by such official or person.

18 U.S.C. § 201 (1988).

[10]  Section 1952 of Title 18 makes it unlawful to:

(a)  travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to))
. . .
(3)  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter perform[] or attempt to perform[] any of the acts specified in subparagraph . . . (3).

18 U.S.C. § 1952 (1988 & Supp. V 1993).

[11]  Section 2 of Title 18 makes it unlawful to "commit[] an offense against the United States or aid[], abet[], counsel[], command[], induce[] or procure[] its commission."  18 U.S.C. § 2 (1988).

[12]  Section 1951 of Title 18 makes it unlawful to:

(a)  . . . in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempt[] or conspire[] so to do, or commit[] or threaten[] physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section.
(b)  As used in this section))
(2)  The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951 (1988).

7

recordings; 2) the district court should not have refused his requested jury instruction on intent to bribe and the evidence was insufficient for the jury to find that he intended to bribe Mauldin; 3) his extortion conviction should be reversed because he was not a public official, the district court improperly refused his requested jury instructions, and the evidence was insufficient to convict him; 4) prosecutorial misconduct prejudiced him; and 5) the district court improperly enhanced his sentence based on Mauldin's official position.

## II

## A

Tomblin argues that the district court should have suppressed certain recorded conversations because 1) the FBI investigators omitted material exculpatory information from the affidavit they submitted to obtain wiretap authorization, 2) the government failed to maintain proper custody of the tapes,[13] and 3) the "consensual" recordings were involuntary.

## 1

Tomblin first asserts that, because the FBI omitted information, the affidavit submitted to obtain authorization to monitor certain phone conversations was deficient. We review the magistrate judge's decision for clear error. *United States v.*

---

[13] Tomblin makes this assertion, but provides no legal argument in his brief that indicates the basis for his contention. Consequently, we do not address it. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) (holding that issues not argued are abandoned).

*Williams*, 737 F.2d 594, 602 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S. Ct. 1354, 84 L. Ed. 2d 377 (1985). Although we presume "validity with respect to the affidavit supporting the search warrant," *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676, 57 L. Ed. 2d 667 (1978), "[d]eference to the magistrate, . . . is not boundless. . . . [T]he deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *United States v. Leon*, 468 U.S. 897, 914, 104 S. Ct. 3405, 3416, 82 L. Ed. 2d 677 (1984); *see also Williams*, 737 F.2d at 602 (defining reckless disregard for truth as when reasons to doubt information's veracity are obvious).

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements or witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 170, 98 S. Ct. at 2684. If the defendant successfully makes this showing, and if the defect in the affidavit is material, the evidence obtained pursuant to the faulty affidavit is inadmissible. *Id.* at 155-56, 98 S. Ct. at 2676; *see also United States v. Stanert*, 762 F.2d 775, 780 (9th Cir.) (discussing two *Franks* elements: 1) that intentional or reckless falsity existed, and 2) that absent invalid information, the remaining affidavit is

9

insufficient for probable cause).

Tomblin contends that the investigators omitted information from their affidavits intentionally or with reckless disregard. Omissions or misrepresentations can constitute improper government behavior. *Stanert*, 762 F.2d at 781 (requiring "a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading"). Moreover, recklessness can in some circumstances be inferred directly from the omission itself. *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (allowing an inference of recklessness from proof of the omission). Unless those omissions are material, however, the affidavit stands. *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing."); *Williams*, 737 F.2d at 604 (omitted facts must be material). "Unless the defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity." *Colkley*, 899 F.2d at 303.

Tomblin makes several assertions that the FBI agents omitted information from their affidavits, including: 1) that they did not reveal a deal for leniency that the agents made with Ladoucer; 2) that they did not reveal that Ladoucer was violating the law by

10

meeting with Chairman Wall; 3) that they did not explain that some of the targets' admissions were made when the targets were intoxicated; and 4) that they failed to reveal that the targets had refused to act unlawfully on several occasions.

The government contends that the evidence contradicts Tomblin's first two assertions. The record reflects that the government did reveal that Ladoucer was expecting a deal in return for his cooperation. The record also reveals that Gonzales testified about the attendees of the meeting with Chairman Wall, and that Ladoucer was not one of them. Therefore, Tomblin's first two contentions lack merit.

Even if we infer recklessness from the omitted exculpatory information as asserted in Tomblin's remaining contentions, *Martin*, 615 F.2d at 329, we also determine whether that information is material, *Colkley*, 899 F.2d at 301; *Williams*, 737 F.2d at 604. The targets may, as Tomblin argues, have refused to break the law as alleged, and they may have been intoxicated as alleged. Neither supports a finding of deliberate falsehood or reckless disregard for truth because the balance of the information submitted in the affidavits is more than sufficient on its own to establish probable cause. Therefore, the absence of exculpatory circumstances for a few of the conversations does not make the remaining information misleading, and the district court's refusal to suppress the tapes does not constitute clear error.

**2**

11

Tomblin also asserts that the "consensual" tape recordings were not voluntarily made. "Voluntariness is a question to be determined from the totality of the circumstances, . . . and we will not disturb the trial court's determination on appeal unless it is clearly erroneous." *United States v. Smith*, 649 F.2d 305, 309 (5th Cir. Unit B 1981) (citations omitted), *cert. denied*, 460 U.S. 1068, 103 S. Ct. 1521, 75 L. Ed. 2d 945 (1983). The government has the burden of proving consent. *United States v. Kolodziej*, 706 F.2d 590, 593 (5th Cir. 1983). It usually meets this burden by demonstrating that "the informant placed the telephone call knowing that it would be monitored." *Id.* at 593. "When, however, there is an allegation of coercion, the government must show that there has been no undue pressure, threats, or improper inducements." *Id.*

Tomblin argues that Ladoucer and Gonzales agreed to the recordings only because they hoped for improved treatment in the prosecutions against them. A hope for leniency, however, does not vitiate consent. *United States v. Jones*, 839 F.2d 1041, 1050 (5th Cir.), *cert. denied*, 486 U.S. 1024, 108 S. Ct. 1999, 100 L. Ed. 2d 230 (1988); *Kolodziej*, 706 F.2d at 595; *United States v. Llinas*, 603 F.2d 506, 508 (5th Cir. 1979), *cert. denied*, 444 U.S. 1079, 100 S. Ct. 1030, 62 L. Ed. 2d 762 (1980); *United States v. Juarez*, 573 F.2d 267, 278 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S. Ct.

12

289, 58 L. Ed. 2d 262 (1978).[14]  Accordingly, Tomblin's challenge
fails.

**B**

Next, Tomblin raises several challenges to his convictions for
bribery.  He contends that the district court erred in refusing to
give his requested jury instruction regarding intent.  He also
asserts that the evidence was insufficient to find that he intended
to bribe Mauldin.

**1**

Tomblin challenges the district court's refusal to grant his
requested jury instruction regarding his intent to bribe Mauldin.[15]

---

[14]    Tomblin cites only to outdated caselaw supporting his contention that
offering leniency vitiates consent. *See, e.g., Weiss v. United States*, 308 U.S.
321, 330, 60 S. Ct. 269, 272-73, 84 L. Ed 298 (1939) (holding that authorization
of intercepts could not be implied from "enforced agreement").

[15]    Tomblin requested that the jury be instructed that:
. . .
The solicitation and offer of campaign contributions and the
payment of expenses related to campaigns are necessary and
permissible forms of political activity and expression.  Such
conduct is not only well within the law, but unavoidable so long as
election campaigns are financed by private contributions and
expenditures.  Thus, the payment of a campaign contribution, the
promise of one, or the reimbursement of travel costs related to a
campaign do not, in and of themselves, constitute bribery.
In order for such to constitute bribery, you must find beyond
a reasonable doubt that Defendant TOMBLIN offered or solicited the
payment of the $725.00 to GLEN MAULDIN and the $50,000 to the Hecht
Re-Election Committee intentionally for an unlawful purpose
intending that its acceptance be conditioned upon GLEN MAULDIN
performing or not performing a defined, explicit official act.
This requires more than some generalized hope or expectation
of ultimate benefit.  the money must have been offered and paid with
the intent and design to influence official action in exchange for
the donation))the payment serving as a condition for a specified and
bargained for action . . . .
Similarly, TOMBLIN contends that any offer or intent to offer
a percentage interest in business ventures was made out of loyalty,
friendship and the qualifications of MAULDIN and HECHT and not with
the intent to influence an official act as alleged . . . .  The
offer, when coupled with such intent, if you find that he had such
intent or if you have a reasonable doubt that he so intended, is not

13

Specifically, he argues that the jury instruction actually given did not require the jury to find an explicit quid pro quo, which is a predicate to the specific intent required. We review jury instructions for abuse of discretion. *United States v. Pennington*, 20 F.3d 593, 600 (5th Cir. 1994). "The refusal to give a jury instruction constitutes error only if the instruction (1) was substantially correct, (2) was not substantially covered in the charge delivered to the jury, and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." *Id.; accord United States v. Aggarwal*, 17 F.3d 737, 745 (5th Cir. 1994); *United States v. Shabazz*, 993 F.2d 431, 440 (5th Cir. 1993).

Under the bribery statutes, the government must prove a quid pro quo, that is, that the official took money in return for an exercise of his official power. *McCormick v. United States*, 500 U.S. 257, ___, 111 S. Ct. 1807, 1815-16, 114 L. Ed. 2d 307 (1991). In order to convict a briber, the government must prove that the accused intended to bribe the official. Intending to make a campaign contribution does not constitute bribery, even though many contributors hope that the official will act favorably because of their contributions. *See United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("[A]ccepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an

made corruptly and does not constitute bribery.
It must be remembered that TOMBLIN is not required to prove his innocent motivation. Rather, the prosecution must prove beyond a reasonable doubt that TOMBLIN did not act innocently . . . .

14

explicit promise to perform or not perform an official act. Vague expectations of some future benefit should not be sufficient to make a payment a bribe."); *United States v. Biaggi*, 909 F.2d 662, 695 (2d Cir. 1990) ("There is a line between money contributed lawfully because of a candidate's positions on issues and money contributed unlawfully as part of an arrangement to secure or reward official action, though its location is not always clear."), *cert. denied*, 499 U.S. 904, 111 S. Ct. 1102, 113 L. Ed. 2d 213 (1991). Accordingly, a jury instruction must adequately distinguish between the lawful intent associated with making a campaign contribution and the unlawful intent associated with bribery. *See United States v. Taylor*, 993 F.2d 382, 385 (4th Cir.) ("Any payment to a public official, whether it be a legitimate campaign contribution or a bribe, is made because of the public office he holds. *Evans* makes clear that the public official must obtain `a payment to which he was not entitled, knowing that the payment was made in return for *official acts*.'" (quoting *Evans v. United States*, ___ U.S. ___, ___, 112 S. Ct. 1881, 1889, 119 L. Ed. 2d 57 (1992)) (emphasis added)), *cert. denied*, ___ U.S. ___, 114 S. Ct. 249, 126 L. Ed. 2d 202 (1993). The instructions requested by Tomblin adequately state the law. Therefore, the question is whether the jury instruction given by the district court "substantially covered" the distinction between the intent to make a legitimate campaign contribution and the intent to bribe. *See Pennington*, 20 F.3d at 600.

15

The district court instructed the jury on the issue of bribery by using Fifth Circuit Pattern Jury Instruction[16] Nos. 2.13 and 2.12.[17] Tomblin argues that the definition of "corruptly" does

[16] Although the fact that the court used a pattern instruction is not conclusive, we encourage their use. *United States v. Williams*, 20 F.3d 125, 132 (5th Cir. 1994) ("[T]he Pattern Jury Instructions provide a useful guide for the district courts, [but] we have never required the trial courts in this Circuit to use any particular language in a jury charge."), *cert. denied*, 63 U.S.L.W. 3264 (U.S. Oct. 3, 1994) (No. 94-5238); *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992) (affirming refusal to give instruction where judge instructed with Fifth Circuit Pattern Jury Instruction).

[17] The actual charge stated as follows:
Title 18, United States Code, Section 201(b)(1), makes it a crime for anyone to bribe a public official. In this case, the Defendant is charged with committing bribery in two different ways.
In counts five and nine, the Defendant is charged with aiding and abetting Glen Mauldin in corruptly demanding, seeking, and receiving something of value in order to be influenced in the performance of official acts.
For you to find the Defendant guilty of bribery in counts five and nine, you must be convinced beyond a reasonable doubt:
First: That Glen Mauldin demanded, sought, or received something of value as described in the indictment.
Second: That Glen Mauldin was, at that time, a public official of the United States or was acting on behalf of the United States.
Third: That Glen Mauldin demanded, sought or received the item of value corruptly in return for being influenced in the performance of an official act; and
Fourth: That the Defendant aided and abetted Glen Mauldin in doing so.
. . .
In count twenty-two the Defendant is charged with bribing Glen Mauldin and with aiding and abetting the bribery. For you to find the Defendant guilty of bribery in count twenty-two, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
First: That the Defendant directly or indirectly gave, offered, or promised something of value to Glen Mauldin; and
Second: That the Defendant did so corruptly with intent to influence an official act by Glen Mauldin.
. . .
An act is "corruptly" done if it is done intentionally with an unlawful purpose. Therefore, in evaluating whether the Government has proved beyond a reasonable doubt that the Defendant bribed or intended to bribe a public official, you must focus specifically on the Defendant's mental state, regardless of the mental state of the public official. Merely because the public official accepts a thing of value with corrupt intent does not mean that the Defendant made the offer with corrupt intent. Indeed, the public official may accept an offer as a bribe, while the Defendant may not possess the same corrupt intent in offering something of value. Again, your focus must be on the Defendant's state of mind.

16

not require the jury to find a *quid pro quo*.  We view a jury instruction, however, in its entirety.  *United States v. Duvall*, 846 F.2d 966, 972 (5th Cir. 1988) (viewing bribery instructions "as a whole"); *United States v. Dozier*, 672 F.2d 531, 542 (5th Cir.) (reviewing not only specific element of bribery instruction, but also other portions of charge that added clarity to challenged element), *cert. denied*, 459 U.S. 943, 103 S. Ct. 256, 74 L. Ed. 2d 200 (1982).  By requiring the jury to find that Glen Mauldin accepted an item of value in return for official acts in counts five and nine, and that Tomblin promised something of value to Mauldin "with intent to influence an official act", the instructions explain the reciprocity element of the *quid pro quo*. These instructions also  distinguish between the levels of intent about which Tomblin is concerned, because they required the jury to find that, in promising something of value to Mauldin and in aiding and abetting Mauldin's acceptance of an item of value, Tomblin had acted corruptly, that is, with unlawful purpose.  Moreover, the instruction clearly required the jury to focus on Tomblin's intent. Tomblin's requested instruction focused pointedly on the specific facts of this case as they related to his defense that he had not intended to bribe Mauldin, but the court's actual instruction allowed Tomblin to present that information and defense to the jury, and we do not require that the instructions do any more. *See Duvall*, 846 F.2d at 972 (affirming instructions that "provided an adequate basis for [defendants] to present to the jury a [specific

17

theory of] defense"); *Dozier*, 672 F.2d at 542 (approving instructions that "fairly presented the issues to the jury").[18] Consequently, the district court did not abuse its discretion when it refused to give the instruction Tomblin requested.

**2**

Assuming the instruction was proper, Tomblin also argues that the evidence was insufficient for the jury to convict him of bribery. *See Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 2788-89, 61 L. Ed. 2d 560 (1979) ("[T]he critical inquiry on review of sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."). To determine sufficiency in a criminal case:

> The evidence is reviewed in the light most favorable to the government, drawing all reasonable inferences in support of the verdict. But if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed. It is not necessary that the evidence exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable constructions of the evidence. The only question is whether a rational jury could have found each element of the offense beyond a reasonable doubt.

*United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994) (citations omitted); *see also United States v. Stephens*, 964 F.2d

---

[18]    *See also Turner*, 960 F.2d at 464 (denying defendant's requested instruction because it was "more a statement of the case than an accurate definition").

18

424, 427 (5th Cir. 1992); *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 320, 121 L. Ed. 2d 248 (1992). The government need not prove the occurrence of the quid pro quo; proof of the agreement will suffice. *Evans v. United States*, 504 U.S. ___, ___, 112 S. Ct. 1881, 1889, 119 L. Ed. 2d 57 (1992) ("[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.").[19] Thus, we "consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds on a quid pro quo." *Carpenter*, 961 F.2d at 827.

Tomblin argues that, at most, he had only a general expectation of future benefit, and that Mauldin and Lachelli were so vague about the terms of the quid pro quo that the government failed to establish its proof beyond a reasonable doubt. "[T]he explicitness requirement is satisfied [, however,] so long as the terms of the quid pro quo are clear and unambiguous." *Id.* Mauldin testified that Tomblin offered him ten percent of the Grenada venture, and that Tomblin encouraged Ladoucer to pay $725.15 for

---

[19] *See also United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993) ("[T]he government does not have to prove an explicit promise to perform a particular act made at the time of payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise."), *cert. denied*, ___ U.S. ___, 114 S. Ct. 929, 127 L. Ed. 2d 221 (1994); *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir.) (refusing to require a specific statement by official regarding intent, otherwise officials could "escape liability . . . with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money"), *cert. denied*, ___ U.S. ___, 113 S. Ct. 332, 121 L. Ed. 2d 250 (1992).

Mauldin's trip to San Antonio, and that Tomblin was arranging for a $50,000 contribution to Senator Hecht's campaign fund. Mauldin also testified that he accepted or agreed to accept these sums as bribes. Lachelli testified that Tomblin intended for ten percent of the Grenada business to go to Mauldin. Lastly, the tapes reveal that Tomblin himself admitted to these acts.[20] Although Tomblin testified at trial to an innocent motivation for each of these actions,[21] the evidence viewed in the light most favorable to the verdict was nonetheless sufficient for the jury to find beyond a reasonable doubt that Tomblin intended to commit and aid and abet in the commission of bribery.[22]

---

[20] When Ladoucer said, "I guess I, uh, have a first class seat to take care of tomorrow," and Mauldin replied that he did not fly first class, Tomblin responded, "You should have." Regarding the fundraiser, Tomblin said, "I want to gear it to the success," and "we're going to guarantee 50,000 here." Lastly, Tomblin's statements about the stock he promised Mauldin included, "I told Glen he got 10%;" "he gets 10% of our side;" "Glen's 10% is going to be split with Chic. . . . But I never said that, and I'll call you a liar from the highest tree." When asked where the money would eventually go, Tomblin answered, "Straight to Chic." When Ladoucer asked how the group would get certain Navy contracts, Tomblin responded, "That's what Chic's job is." Tomblin also made statements about his own understanding that Mauldin would attend the meeting with Chairman Wall to show Ladoucer's "stroke" with Senator Hecht. Lastly, in a discussion over their Grenadan plans, Tomblin stated, "The reason Glen [Mauldin] is going to stay involved is because then we can get some IMF money deposited."

[21] Specifically, Tomblin testified that: "I wanted to reserve ten percent of the stock to offer to someone in the future," and "it was still something that was going to be discussed after they left office." In response to a question about a link between the fundraiser and the meeting with Chairman Wall, Tomblin replied, "Absolutely not."

[22] Because we find the evidence sufficient to justify the jury's verdict on the bribery counts, we do not address Tomblin's arguments that, because he should not have been convicted of bribery, his aiding and abetting and conspiracy convictions are invalid. *See United States v. Curran*, 20 F.3d 560, 571 (3d Cir. 1994) (requiring reversal of conspiracy conviction only if underlying illegality reversed).

## C

Tomblin also challenges his extortion conviction on several grounds. He argues first that the evidence was insufficient to support the jury's finding that the alleged extortion affected interstate commerce. He also argues that, because he was not a public official, he could not be convicted of extorting money under color of official right. Next, Tomblin contends that the district court improperly refused to give his requested instruction regarding fear of economic harm. He further asserts that the evidence was insufficient to convict him of extorting money through fear of economic harm. Lastly, he argues that, even if the evidence was sufficient on the fear of economic harm theory, the insufficiency on the under color of official right theory requires reversal because the instructions asked only for a general verdict on the extortion count.[23]

## 1

Tomblin argues that the government failed to establish that the alleged extortion affected interstate commerce. An effect on interstate commerce is a required element of the offense of extortion under the Hobbs Act. *United States v. Stephens*, 964 F.2d 424, 429 (5th Cir. 1992). Such an effect, however, need only be slight. *United States v. Coyne*, 4 F.3d 100, 111 (2d Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 929, 127 L. Ed. 2d 221

---

[23]     The court instructed the jury that it could find Tomblin guilty of extortion "by wrongful use of actual or threatened fear of economic harm *or* under color of official right" (emphasis added).

(1994); *see also Stephens*, 964 F.2d at 429 ("The impact on interstate commerce need not be substantial to meet the statutory requirement; all that is required is that commerce be affected by the extortion."); *United States v. Haimowitz*, 725 F.2d 1561, 1573 (11th Cir.) ("[A] showing of minimal effect on interstate commerce will sustain jurisdiction under the statute."), *cert. denied*, 469 U.S. 1072, 105 S. Ct. 563, 83 L. Ed. 2d 504 (1984). The government established that Suburban funds crossed state borders as a normal part of its business. Indeed, the loan to Tomblin was for an out-of-state restaurant. Payment from funds of a business engaged in interstate commerce satisfies the requirement of an effect on interstate commerce. *Coyne*, 4 F.3d at 111. Consequently, the evidence was sufficient to support the jury's finding that the alleged extortion affected interstate commerce.

**2**

Tomblin next contends that, because he was a private citizen, he cannot be convicted of extortion under color of official right. Usually, only public officials are charged with extorting property under color of official right. *See United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir.) (discussing trial court's definition that "extortion under color of official right means the wrongful taking by a public officer of money or property not due to the officer or the office"), *cert. denied*, ___ U.S. ___, 112 S. Ct. 380, 116 L. Ed. 2d 331 (1991). The official need not actually have the powers he threatens to use, nor is the offense limited to

22

elected officials.  *See United States v. Freeman*, 6 F.3d 586, 593 (9th Cir. 1993) ("[T]he Hobbs Act reaches anyone who actually exercises official powers, regardless of whether those powers were conferred by election, appointment, or some other method."), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1661, 128 L. Ed. 2d 378 (1994). Moreover, the victim need not actually know the official's position; it is enough that the victim reasonably believe the official can do what he threatens.  *Stephens*, 964 F.2d at 430 (holding that victim need not know extortioner's official position, so long as victim believes extortioner has power to carry out threats).  Private persons have been convicted of extortion under color of official right, but these cases have been limited to ones in which a person masqueraded as a public official,[24] was in the process of becoming a public official,[25] or aided and abetted a public official's receipt of money to which he was not entitled.[26] All these cases involved a public official in some past, present, or future capacity receiving money.

In contrast, the extortion for which Tomblin was convicted))coercing the $250,000 loan from Ladoucer and

---

[24]    *See United States v. McClain*, 934 F.2d 822, 830 (7th Cir. 1991) (acknowledging that "under color of official right" can apply to private person masquerading as official).

[25]    *See United States v. Meyers*, 529 F.2d 1033, 1036-37 (7th Cir.) (affirming conspiracy conviction even though defendants were not officials yet), *cert. denied*, 429 U.S. 894, 97 S. Ct. 253, 50 L. Ed. 2d 176 (1976).

[26]    *See United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir. 1982) (affirming private person's conviction for aiding and abetting public official's extortion), *cert. denied*, 461 U.S. 913, 103 S. Ct. 1891, 77 L. Ed. 2d 282 (1983).

23

Gonzalez))did not result in the receipt of money by any public official.  Tomblin was not a public official, nor was he in the process of becoming one.  Moreover, although he may have "cloaked" himself in the Senator's authority, as the government argues, no one believed that he was a public official, especially not his purported victims, Ladoucer and Gonzales.  He was convicted of threatening to use his political influence against Ladoucer and Gonzales, but this power was not official power; it was unofficial power over an official.

Determining whether Tomblin's actions can constitute acting under color of official right requires us to interpret the statutory language of the Hobbs Act.  The plain meaning of the statute does not clearly indicate who can act under color of official right, *Freeman*, 6 F.3d at 592 ("The Hobbs Act does not define `under color of official right.'"), although the very use of the word "official" suggests that an official must be involved in some manner for an offense to occur.  Consequently, we look to the legislative history for further guidance.  Although the legislative history of the original Anti-Racketeering Act did not discuss "under color of official right,"[27] that of the Hobbs Act[28] provides a glimmer of direction.  It indicates that Congress preserved the

---

[27]    *See* H.R. Rep. No. 1833, 73d Cong., 2d Sess. 1-2 (1934); S. Rep. No. 532, 73d Cong., 2d Sess. 1-2 (1934).

[28]    *See* S. Rep. No. 1516, 79th Cong., 2d Sess. 1 (1946); H. R. Rep. No. 238, 79th Cong., 1st Sess. 1-2 (1945).

common law definition of extortion,[29] under which extortion could only be committed by a public official.[30]

In passing the Hobbs Act, Congress intended to make a distinction between the "fear of harm" ground and the "under color of official right" ground. *United States v. McClain*, 934 F.2d 822, 830 (7th Cir. 1991). This is understandable because the official's position provides the coercive element that the threats and fear of the other ground supply. *Id.* Accordingly, we agree with the Seventh Circuit that in circumstances such as those in this case, a private person cannot be convicted of extortion under color of official right. *See McClain*, 934 F.2d at 831 ("[A]s a general matter and with caveats as suggested here, proceeding against private citizens on an `official right' theory is inappropriate under the literal and historical meaning of the Hobbs Act, irrespective of the actual `control' that citizen purports to maintain over governmental activity.").

**3**

Tomblin also challenges the district court's refusal to grant

---

[29]   91 Cong. Rec. 11908 ("The definitions of . . . extortion set out in this bill . . . are defined in substantially the same way by the laws of every state in the Union.") (statement of Rep. Robson); *id.* at 11914 ("Wherever jurisprudence has had its sway robbery and extortion have been defined. There is no use defining those terms because they are so well defined that their definition now is a matter of common knowledge.") (statement of Rep. Russell).

[30]   *See United States v. Nardello*, 393 U.S. 286, 289, 89 S. Ct. 534, 536, 21 L. Ed. 2d 487 (1969) ("At common law a public official who under color of office obtained the property of another not due either to the office or the official was guilty of extortion."); *United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir. 1972) (defining common law extortion as "a crime which could only be committed by a public official"); James Lindgren, *The Elusive Distinction Between Bribery and Extortion:  From the Common Law to the Hobbs Act*, 35 U.C.L.A. L. Rev. 815 (1988) (narrating the common-law history of extortion).

25

his requested jury instruction regarding fear of economic harm.[31] Specifically, he argues that the jury instruction actually given did not require the jury to find a fear of actual harm.[32] Extortion by wrongful use of fear includes fear of economic harm. *United States v. Garcia*, 907 F.2d 380, 381 (2d Cir. 1990); *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976), *cert. denied*, 429 U.S. 1123, 97 S. Ct. 1160, 51 L. Ed. 2d 573 (1977). Although the defendant must at least know of the potential harm, we consider the existence of fear from the perspective of the victim. *Garcia*, 907

---

[31]    Defendant's Requested Instructions #27-30 stated that:

Before TOMBLIN can be convicted of extortion, the government must also prove that he obtained the property from Suburban Savings and Loan Association by the wrongful use of fear of economic loss or harm. The fear must be the loss of something to which Suburban was legally entitled. If the loan was made because Suburban felt that it stood to gain by making the loan, and not out of fear of economic loss, that is not extortion. In other words, if Suburban had no reason to fear an economic loss upon not making the loan, but instead, stood only to improve its economic condition by making the loan, TOMBLIN is not guilty of extortion.

Further, before you may convict TOMBLIN of extortion as alleged in Count 3 of the Indictment, you must find beyond a reasonable doubt that TOMBLIN knew the loan was being made because Suburban Savings and Loan feared an economic loss. TOMBLIN claims that he believed Suburban was making the loan because it was sufficiently collateralized; because he believed he was financially capable of obtaining the loan and that Suburban held a similar belief; and that the loan was of mutual benefit for each party and, therefore, properly negotiated . . . .

Before TOMBLIN can be found guilty of extortion as alleged in count three of the indictment, you must find beyond a reasonable doubt that he received the loan from Suburban Saving and Loan Association knowing that he was not legally entitled to receive it and further knowing that the loan was being made because Suburban feared an economic loss.

TOMBLIN asserts that he believed the loan was sufficiently collateralized, that it was made for value, i.e. a negotiated interest rate, and that it was made for a proper business purposes))the completion of his restaurant. Under such terms, TOMBLIN claims he believed he was obtaining the loan properly. If you find that TOMBLIN so believed, or you have a reasonable doubt as to whether or not he so believed, you must acquit TOMBLIN . . . .

[32]    *See supra* Part II.B.1 for the proper standard of review for challenges to jury instructions.

26

F.2d at 385 ("[T]he government must at least prove the existence of the victim's belief that the defendant had the power to harm it and the victim's fear that the defendant would exploit that power."); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (considering fear "from the perspective of the victim, not the extortionist; the proof must establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to their victim's detriment"). Moreover, the defendant need not create the fear, so long as the defendant uses it to extort property. *United States v. Gerald*, 624 F.2d 1291, 1299 (5th Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S. Ct. 1369, 67 L. Ed. 2d 348 (1981). The fear, however, must be of a loss;[33] fear of losing a potential benefit does not suffice.[34] Again, both the instructions requested as well as those actually given correctly address the law. *Pennington*, 20 F.3d at 600. Consequently, the issue is whether the instruction given by the trial court substantially covers the applicable law necessary for Tomblin to argue his theory of defense. *Id.*

As with the bribery counts, the trial court instructed on extortion in accordance with the Fifth Circuit Pattern Jury

---

[33] *See Haimowitz*, 725 F.2d at 1572 (upholding extortion conviction where license vital to economic health of business and official threatened to quit helping if not paid).

[34] *See Capo*, 817 F.2d at 954 (finding no extortion by fear of economic harm where "all the evidence points to the conclusion that they paid voluntarily to improve their chances to get jobs they had not been able to obtain on their own").

Instructions 2.68 and 2.69.[35]  Tomblin argues that the instruction

given does not adequately distinguish between fear of an actual

loss and fear of deprivation of a future benefit.  The instruction

as given fully allowed Tomblin to argue that Ladoucer and Gonzales

only feared that they would not receive the benefit of a meeting

with Chairman Wall, and that consequently, their fear was not of an

actual loss.  *See United States v. Turner*, 960 F.2d 461, 464 (5th

Cir. 1992) (denying defendant's requested instruction because "more

a statement of the case than an accurate definition").[36]  Therefore,

---

[35]      The actual instruction read as follows:
     Count three of the indictment charges the Defendant with
extortion.
     Title 18, United States Code, Section 1951(a), makes it a
crime for anyone to obstruct commerce by extortion.  Extortion means
the obtaining of or attempting to obtain property from another, with
that person's consent, when the consent is induced by wrongful use
of actual or threatened fear of economic harm [or] under color of
official right.
     For you to find the Defendant guilty of this crime, you must
be convinced that the Government has proved each of the following
beyond a reasonable doubt:
     First:  That the Defendant obtained property from another with
that person's consent;
     Second:  That the Defendant did so by wrongful use of actual
or threatened fear of economic harm or under color of official
right; and
     Third:  That the Defendant's conduct interfered with and
affected interstate commerce.
. . .
     The term "fear" includes fear of economic loss or damage.  It
is not necessary that the Government prove that the fear was a
consequence of a direct threat; it is sufficient for the Government
to show that the victim's fear was reasonable under the
circumstances.
     The use of actual or threatened fear is "wrongful" if its
purpose is to cause the victim to give property to someone who has
no legitimate claim to the property.

[36]      *See also United States v. Duvall*, 846 F.2d 966, 972 (5th Cir. 1988)
(affirming instructions that "provided an adequate basis for [defendants] to
present to the jury a [specific theory of] defense"); *United States v. Dozier*,
672 F.2d 531, 542 (5th Cir.) (approving instructions that "fairly presented the
issues to the jury"), *cert. denied*, 459 U.S. 943, 103 S. Ct. 256, 74 L. Ed. 2d
200 (1982).

28

the instruction as given substantially covers the law and allowed Tomblin to argue his theory of defense, and the district court did not abuse its discretion in refusing to instruct as requested.

**4**

Assuming that the instruction was proper, Tomblin further argues that the evidence was insufficient for the jury to convict him of extortion by wrongful use of fear of economic harm.[37] Tomblin argues that Ladoucer and Gonzalez only feared that they would not receive a meeting with Chairman Wall, and that this fear was insufficient to support an extortion conviction. *See Garcia*, 907 F.2d at 383 (reversing conviction where victim merely hoped for improved chances on future contracts, because paying for beneficial activity "is not the mindset of a victim of economic extortion"); *Capo*, 817 F.2d at 954 (reversing conviction where victims desired better probability that they would secure employment). We distinguish these cases, however, because although Ladoucer and Gonzalez did fear they would not get their meeting, they primarily feared that they would lose their investment in Suburban.[38] Moreover, it was Tomblin who first convinced Ladoucer and Gonzalez to forgo other avenues and seek forbearance; they had already taken action in reliance on his promise of help before he made his demand for money. Accordingly, the evidence of that loss does qualify

---

[37] *See supra* Part II.B.2 for the proper standard of review for challenges to the sufficiency of the evidence.

[38] Gonzalez testified that, "We'd have to let our money sit in Suburban Savings," and "We would have lost $1,000,000."

29

under the statute.  Gonzalez testified that Tomblin threatened not to help them unless they either paid him a fee or gave him a loan.[39] Consequently, the evidence sufficiently supported the jury's finding that Tomblin had extorted money by wrongful use of fear of economic harm beyond a reasonable doubt.

**5**

Even though the evidence was sufficient to convict Tomblin of extortion by wrongful use of fear of economic harm, he contends that the insufficiency of the "under color of official right" prong requires a reversal because both theories were submitted to the jury on a single count.  When only one of multiple theories submitted to a jury is sufficient, whether this requires reversal depends on the nature of the insufficiency.

> [W]hen disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, appeals based on evidentiary deficiencies must be treated differently than those based on legal deficiencies.  If the challenge is evidentiary, as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed.  However, if the challenge is legal and any of the theories was legally insufficient, then the verdict must be reversed.

*United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993).  The reason for the varying treatment is that jurors can, from their own experience, weed out evidentiary deficiencies,[40] but not legal

---

[39]    Gonzalez stated: "[B]asically what he told me in a nutshell was, `If you don't lend me the $250,000, then it's going to cost you $100,000 to see the Senator and Danny Wall in Washington, D.C., and that's coming to me as a fee.'"

[40]    *See United States v. Self*, 2 F.3d 1071, 1093 (10th Cir. 1993) (requiring reversal "if the jury could have based its verdict on a legally or constitutionally infirm objective; however, factual insufficiency of one or more objectives does not require reversal as we will presume that the jury rejected

insufficiencies.[41]

Legal insufficiency occurs when, even if the government proved everything it possibly could prove, the defendant's conduct would not constitute the crime charged. *Self*, 2 F.3d at 1093 (reversing conviction where, for one theory, "both the government and the district court were mistaken about the law . . . and, therefore, Defendant's actions were not within the statutory definition of the crime"). Because Tomblin was not a public official, conviction for extortion could have been based on a legally insufficient ground. Therefore, even if the evidence and instructions properly allowed the jury to convict on a theory of fear of economic harm, we cannot presume that the jury based its verdict on the legally sufficient ground, and we must reverse Tomblin's extortion conviction.

**D**

Tomblin further contends that the district court should have granted him a new trial on the grounds of prosecutorial misconduct. He first argues that the prosecutor's cross-examination of one of his witnesses went beyond the scope of direct examination. Next, he asserts that the prosecutor improperly injected inadmissible character evidence into his cross-examination of Tomblin. Lastly, he contends that the prosecutor made improper, prejudicial comments

---

the factually inadequate theory and convicted on an alternative ground for which the evidence was sufficient").

[41] *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 474, 116 L. Ed. 2d 371 (1991) ("When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is not reason to think that their own intelligence and expertise will save them from error.").

31

during closing arguments.

Because Tomblin did not preserve error by objecting to these instances of alleged prosecutorial misconduct at trial, we review these claims only for plain error. *See* Fed. R. Evid. 103 (requiring specific and timely objection to errors affecting substantial rights, but allowing notice of "plain errors affecting substantial rights although they were not brought to the attention of the court"). "[A]n error must be clearly evident to be plain . . . ." *United States v. Calverley*, 37 F.3d 160, 163 (5th Cir. 1994) (en banc); *see also United States v. Olano*, ___ U.S. ___, ___, 113 S. Ct. 1770, 1777, 123 L. Ed. 2d 508 (1993) ("`Plain' is synonymous with `clear' or, equivalently, `obvious.'"); *Peretz v. United States*, 501 U.S. 928, ___, 111 S. Ct. 2661, 2678, 115 L. Ed. 2d 808 (1991) (Scalia, J., dissenting) (holding plain error to be "errors that are obvious"); *United States v. Young*, 470 U.S. 1, 16 n.14, 105 S. Ct. 1038, 1047 n.14, 84 L. Ed. 2d 1 (1985) (equating "plain" with "readily apparent"). Moreover, even if we find plain error, it is within our discretion whether or not to reverse. *See Olano*, ___ U.S. at ___, 113 S. Ct. at 1778 ("Rule 52(b) [defining plain error] is permissive, not mandatory. . . . [T]he Court of Appeals has authority to order correction, but is not required to do so."); *Calverley*, 37 F.3d at 164 ("[A]n appellate court is empowered, in its discretion, to correct the assigned error.").

**1**

Tomblin first argues that the prosecutor's cross-examination

32

of George Chall, Tomblin's witness, about Tomblin's connection to bankrupt restaurants exceeded the scope of direct examination. Rule 611(b) of the Federal Rules of Evidence requires that cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Fed. R. Evid. 611(b). The subject matter of direct examination, for the purpose of cross-examination, is "liberally construed to include all inferences and implications arising from such testimony." *United States v. Arnott*, 704 F.2d 322, 324 (6th Cir.), *cert. denied*, 464 U.S. 948, 104 S. Ct. 364, 78 L. Ed. 2d 325 (1983). Rule 611 allows, but does not require, the district court to permit cross-examination that exceeds the scope of direct examination. *United States v. Lowenberg*, 853 F.2d 295 (5th Cir. 1988), *cert. denied*, 489 U.S. 1032, 109 S. Ct. 1170, 103 L. Ed. 2d 228 (1989).

Tomblin contends that his direct examination of Chall focused on Chall's introduction of Ladoucer to Tomblin and Ladoucer and Tomblin's subsequent business dealings. On direct examination, Chall testified that Ladoucer informed him that he had mortgage notes that he wanted to sell, and that he had heard that Tomblin was involved with a mortgage company. Chall testified that he arranged a meeting between Ladoucer and Tomblin so that they could discuss the sale of mortgage notes. On cross-examination, the prosecutor asked Chall if he knew that Tomblin had been involved with bankrupt restaurants and Chall said that he did. Tomblin did

33

not object.[42]    The prosecutor directed the cross-examination questions at what Chall knew about Tomblin's business dealings, and we can fairly infer the questions' basis from the direct examination.  Consequently, we find no error on this point.

Tomblin also argues that, because Chall did not testify about Tomblin's character, the prosecutor's questions to Chall about Tomblin's character on cross-examination were outside the scope of direct examination.[43]  If so, then Chall's testimony about Tomblin's character constitutes impermissible character evidence under Federal Rule of Evidence 404(b).[44]  The two-prong test outlined in

---

[42]    Tomblin did object to the prosecution's cross-examination questions to Chall concerning Tomblin's involvement in business enterprises in Las Vegas and the trial court overruled the objection.  However, Tomblin's objection must fully apprise the trial court of the specific grounds of the objection. *United States v. Waldrip*, 981 F.2d 799, 804 (5th Cir. 1993).  "A loosely formulated and imprecise objection will not preserve error." *United States v. Jimenez Lopez*, 873 F.2d 769, 773 (5th Cir. 1989).  Tomblin did not specifically object to the prosecutor's questions about Tomblin's involvement with restaurants allegedly gone bankrupt.  Further, Chall testified that one of the alleged bankrupt restaurants was located in Las Vegas, and a second was located in Austin, Texas.  Tomblin's objection, therefore, did not meet the specificity requirements of Rule 103.  Fed. R. Evid. 103(a)(1).

[43]    On cross-examination, the prosecutor asked Chall whether Tomblin had ever bragged to Chall about how much money Tomblin had made on the restaurant bankruptcies.

Q:    There was a restaurant in Las Vegas that went bankrupt, and a restaurant in Austin that went bankrupt, correct?
A:    Yes.
Q:    Darrell Tomblin ever brag to you about how much money he made on those ventures?
A:    No, sir.
Q:    Did he ever tell you about how much money he made in bankruptcies on those?
A:    No, sir.

Because the prosecutor's questions insinuated that Tomblin was guilty of some wrong, misconduct, or crime in relation to the restaurant bankruptcies, the questions also commented on Tomblin's character. *See United States v. Park*, 525 F.2d 1279, 1284-85 (5th Cir. 1976) (criticizing insinuating questions that imply wrongdoing).

[44]    Rule 404(b) states that:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

*United States v. Beechum*[45] applies to the admissibility of evidence under Rule 404(b). First, the evidence must be relevant to an issue other than the defendant's character, and second, the evidence must comply with Rule 403 in that its probative value must not be substantially outweighed by undue prejudice. 582 F.2d at 911.[46]

A review of the record reveals nothing in Tomblin's direct examination of Chall that provided grounds for the prosecutor to cross-examine Chall on Tomblin's character.[47] Further, the prosecutor's questions to Chall did not relate to Tomblin's business dealings, but to Tomblin's alleged bragging about profiting from his businesses' bankruptcies.[48] Thus, the questions

---

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

[45] 582 F.2d 898 (5th Cir. 1978), *cert. denied*, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979).

[46] Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

[47] Because we conclude that Chall did not testify about Tomblin's character, we do not reach Tomblin's alternative argument that even if Chall testified about Tomblin's character, the prosecutor's cross-examination about Tomblin's alleged misconduct was not made in good faith, as required by Federal Rule of Evidence 608(b).

[48] The prosecutor apparently based these questions on an FBI investigation of Tomblin's bankruptcies.

did not relate to any issue other than Tomblin's character and fail the threshold inquiry under Rule 404(b). *See Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 1499, 99 L. Ed. 2d 771 (1988) (requiring court to examine first whether character evidence under Rule 404(b) is probative of material issues other than character). Moreover, it is unlikely that Chall's negative responses to the prosecutor's questions controverted the insinuation of misconduct. *See United States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir. 1985) ("The prejudice to the defendant was, thus, created by the question itself rather than by the testimony given in response."). Thus, the probative value of the prosecutor's cross-examination of Chall regarding Tomblin's character was substantially outweighed by its prejudicial affect and, therefore, it fails the second prong of the *Beechum* test. However, a review of the entire record and the evidence against Tomblin convinces us that the introduction of the character testimony does not require reversal, because the jury would have returned a verdict of guilty against Tomblin even without the prejudicial testimony. *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S. Ct. 1974, 1981, 76 L. Ed. 2d 96 (1983) (noting that "there can be no such thing as an error-free, perfect trial . . ." and denying reversal because the error was harmless beyond a reasonable doubt).[49]

---

[49] We note that, had we addressed Tomblin's Rule 608(b) good faith argument, we would have reached the same conclusion.

36

Tomblin also argues that, because the prosecutor did not provide advance notice, the introduction of evidence of other bad acts when cross-examining Tomblin violated Federal Rule of Evidence 404(b).[50] The government contends that the other-acts evidence was proper under Rule 608(b) because it was introduced only to impeach Tomblin and was not offered in the prosecutor's case in chief.[51] Whether Rule 404(b) or Rule 608(b) applies to the admissibility of other-act evidence depends on the purpose for which the prosecutor introduced the other-acts evidence. *United States v. Schwab*, 886 F.2d 509, 511 (2d Cir. 1989), *cert. denied*, 493 U.S. 1080, 110 S. Ct. 1136, 107 L. Ed. 2d 1041 (1990). Rule 404(b) applies when other-acts evidence is offered as relevant to an issue in the case, such as identity or intent. *Id*. Rule 608(b) applies when other-acts evidence is offered to impeach a witness, "to show the character of the witness for untruthfulness," or to show bias. *Id*.

---

[50] Rule 404(b) requires the prosecution in a criminal case to provide notice in advance of trial of its intent to use other acts evidence. Fed. R. Evid. 404(b) advisory committee notes (stating that the purpose of the notice requirement is to reduce surprise and promote early resolution of admissibility issues).

[51] Rule 608(b) states that: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . ." Fed. R. Evid. 608(b). Unlike Rule 404(b), however, Rule 608(b) does not require advance notice of the prosecutor's intent to use specific instances of defendant's conduct to impeach the defendant when he testifies. *United States v. Baskes*, 649 F.2d 471, 477 (7th Cir. 1980) ("No rule or rationale guarantees the defense advance knowledge of legitimate impeachment before it calls a witness."), *cert. denied*, 450 U.S. 1000, 101 S. Ct. 1706, 68 L. Ed. 2d 201 (1981).

The prosecutor contends that his cross-examination questions were probative of Tomblin's character for truthfulness.

A defendant makes his character an issue when he testifies. *Waldrip*, 981 F.2d at 803; *United States v. Blake*, 941 F.2d 334, 340 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 113 S. Ct. 596, 121 L. Ed. 2d 533 (1992). The government is entitled to cross-examine properly and effectively a witness in an effort to elicit the truth. *United States v. Havens*, 446 U.S. 620, 626-27, 100 S. Ct. 1912, 1916, 64 L. Ed. 2d 559 (1980). However, "a prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *United States v. Silverstein*, 737 F.2d 864, 868 (10th Cir. 1984). Rather, "Rule 608 authorizes inquiry only into instances of misconduct that are `clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement." *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981) (citing Fed. R. Evid. 608); *see also Waldrip*, 981 F.2d at 803 (applying *Leake* standard to forgery evidence).

When Tomblin testified, the prosecutor questioned him on cross-examination about alleged acts of misconduct. Tomblin complains of the prosecutor's cross-examination questions about an alleged F.E.C. investigation of Tomblin's involvement in a political candidate's campaign, Tomblin's alleged hiring of a lawyer to pay-off foreign officials, and an investigation of Tomblin by the F.B.I. for alleged bankruptcy fraud. Tomblin also

38

complains of the prosecutor's cross-examination about whether Tomblin had skimmed $110,000 from his bankrupt restaurant in Austin, Texas, put the money in a shoe box, and fled from Texas to Florida. The prosecutor's cross-examination questions were directed at Tomblin's alleged acts of fraud, bribery, and embezzlement.[52] As such, the prosecutor's questions were probative of Tomblin's character for truthfulness and were permissible under Rule 608(b). Accordingly, we conclude that the provision of Rule 404(b) that requires the prosecutor to give notice of his intention to use other-acts evidence does not apply here.[53]

### 3

Tomblin next argues that the prosecutor made improper remarks during his closing argument which constitute plain error and require reversal. When the prosecutor's remarks during closing argument are both inappropriate and harmful, a defendant may be entitled to a new trial. *United States v. Simpson*, 901 F.2d 1223, 1227 (5th Cir. 1990), *cert. denied*, ___ U.S. ___, 114 S. Ct. 486, 126 L. Ed. 2d 436 (1993). The prosecutor's improper remarks

---

[52] Rule 608(b) does require a good-faith basis for the questions. Tomblin, however, did not raise lack of good faith in a contemporaneous objection. Further, the record shows that the prosecutor gathered his foundation from the wiretaps.

[53] In a pretrial hearing, Tomblin stated that if the prosecutor intended to introduce Rule 404(b) evidence, Tomblin would seek to limit its use through his motion in limine. The prosecutor responded that he did not intend to introduce Rule 404(b) evidence, but he reserved the right to introduce evidence of other misconduct to impeach Tomblin should Tomblin testify. It is not clear that the judge gave a ruling on this part of the motion. Because we find the evidence permissible under Rule 608(b), we do not address Tomblin's argument that the evidence violated his 404(b) motion.

standing alone, however, are insufficient to overturn a criminal conviction. *United States v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044, 84 L. Ed. 2d 1 (1985). Rather, the defendant must show that the prosecutor's remarks affected his substantial rights. *Simpson*, 901 F.2d at 1227.[54] "To determine whether the argument affected the defendant's substantial rights, we examine (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *Simpson*, 901 F.2d at 1227; *Lowenberg*, 853 F.2d at 302.

Tomblin first contends that the prosecutor's comments on Tomblin's cross-examination testimony were improper because the prosecutor did not "force" Tomblin to respond to the questions and therefore did not have "evidence" from Tomblin. During closing arguments, however, the prosecutor may give a fair appraisal of the defendant's testimony. *See Simpson*, 901 F.2d at 1227 (permitting prosecutor to paraphrase and summarize testimony); *Beechum*, 582 F.2d at 898 (permitting prosecutor to appraise defendant's testimony). The prosecutor referred in his closing argument to Tomblin's failure to admit or deny on cross-examination whether he removed money from his bankrupt Austin restaurant and Tomblin's

---

[54]    *See also United States v. Carter*, 953 F.2d 1449, 1457 (5th Cir.) ("This Court's task in reviewing a claim of prosecutorial misconduct is to decide whether the misconduct casts such serious doubt upon the correctness of the jury's verdict."), *cert. denied*, ___ U.S. ___, 112 S. Ct. 2980, 119 L. Ed. 2d 598 (1992); *Lowenberg*, 853 F.2d at 301 (questioning "not [merely] the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial").

response that instead asked the prosecutor whether he had any tapes.[55] Since Tomblin had placed his credibility at issue when he testified, it was not impermissible for the prosecutor to give a fair appraisal of Tomblin's testimony that implicated his credibility. Consequently, the prosecutor's appraisal of Tomblin's cross-examination testimony was proper.

Tomblin also contends that the prosecutor implied that Tomblin's own attorney believed he was guilty of the crimes charged. Statements in closing argument that presuppose a defendant's guilt can be the sort of "foul blows" long held improper. *United States v. Goff*, 847 F.2d 149, 164 (5th Cir.), *cert. denied*, 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1988). In the prosecutor's rebuttal closing argument, he stated that Tomblin's attorney did not want to try the case because the evidence was overwhelming; instead, Tomblin's attorney attempted to put other persons on trial.[56] Taken in context, the prosecutor did

_____

[55]   "Finally, ladies and gentlemen, if you have any lingering doubt about Darrell Tomblin's corrupt intent, think back, please, to the time when Mr. Bennett was asking him about skimming the $110,000 from the bar receipts from the bar in Austin and taking those receipts to Sarasota with him in a shoe box and then asking Robert Dejong to lie to the F.B.I. for him. Darrell Tomblin didn't deny it and he didn't admit it. What he did was say, 'Do you have any tapes? Do you have any tapes?' When it comes to the crimes charged here))here, we have tapes."

[56]   The prosecutor commented:
[I]t was quite clear [defense counsel] and Mr. Tomblin did not want to try the case. They did not want to appear before you. . . . This is a case that is truly overwhelming in the strength of its evidence. Knowing what all the evidence would be, I don't blame them for not wanting the try the case. Instead, they tried to shift who was on trial here. . . . They tried to try a different case. He strove mightily to try someone else. He wanted to put Glen Mauldin

41

not imply that Tomblin's attorney himself believed that Tomblin was guilty. Rather, the prosecutor fairly commented on the weight of the evidence and Tomblin's trial strategy. Accordingly, the prosecutor's comments were neither improper nor harmful.

Tomblin lastly contends that the prosecutor bolstered his case and the testimony of his witnesses by investing them with the integrity of the state.[57] The possible prejudice of a prosecutor's "reverse conspiracy" argument is that the jury could reasonably infer that it must "abandon confidence in the integrity of the government" before it could acquit the defendant. *Goff*, 847 F.2d at 164. Additionally, such argument could bolster its witnesses in the eyes of the jury by stamping them with the integrity of the sovereign. *United States v. Dorr*, 636 F.2d 117, 119-20 (5th Cir. Unit A 1981). The prosecutor's remark in this case is similar to the one condemned as prejudicial in *Goff*. Consequently, we examine the effect of any cautionary instructions given by the trial judge and the strength of the evidence suggesting guilt to see if they attenuate the prejudice of the prosecutor's statement. *Simpson*, 853 F.2d at 1227; *see also Goff,* 847 F.2d at 165 (evaluating "whether the jury would have found appellants guilty had it not been for the prosecutor's improper argument," and considering the

---

on trial; he wanted to put Leo Ladoucer on trial; he wanted to put Vince Lachelli on trial; Glen Mauldin))everyone, everyone was to be on trial except him.

[57] The prosecutor stated to the jury in his rebuttal closing argument that they would have to disregard the testimony of the prosecution's witnesses in order to believe Tomblin's testimony, and that doing so would require that they believe that the government had conspired to "craft" its case.

degree of prejudice, the effectiveness of curative instructions, and the weight of the evidence supporting guilt).

The trial court instructed the jury prior to opening statements that the opening and closing arguments of both the prosecutor and the defendant did not constitute either evidence or instructions on the law. We presume that the jury follows the instructions of the trial court unless there is an "overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." *United States v. Barksdale-Contreras*, 972 F.2d 111, 116 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1060, 122 L. Ed. 2d 366 (1993). Tomblin presents no convincing argument that the jury did not follow the instruction given by the trial court. Also, there was substantial evidence of Tomblin's guilt, including witness testimony and the taped conversations. Therefore we conclude that the trial court's instructions and the weight of the evidence against Tomblin dissipated the potential prejudice of the prosecutor's statements,[58] and the error does not require reversal.[59]

**E**

Tomblin lastly argues that the district court erred when it found that Mauldin occupied a sensitive government position and, as

---

[58] *See Lowenberg*, 853 F.2d at 302 (approving similar cautionary instruction regarding the function of the attorneys' opening and closing arguments); *cf. Carter*, 953 F.2d at 1457 (approving district court's curative instruction that prosecutor's questions do not constitute evidence).

[59] *See Blake*, 941 F.2d at 341 (finding harmless error when remaining evidence "more than sufficient to establish that any reasonable juror would have to conclude that [the defendant] was not credible").

a consequence, applied an eight-level upward departure.  "In the appellate review of sentences, we examine factual findings subject to the `clearly erroneous' standard . . . , and we afford great deference to the trial judge's application of the sentencing guidelines."  *United States v. Humphrey*, 7 F.3d 1186, 1189 (5th Cir. 1993).

Under the Sentencing Guidelines, "[i]f the offense involved a payment for the purpose of influencing . . . any official holding a high-level decision-making or sensitive position, [the base offense level] increase[s] by 8 levels."  United States Sentencing Commission, *Guidelines Manual*, § 2C1.1(b)(2)(B) (1993).  That a position requires the exercise of some discretion alone does not mandate finding that the possessor of that discretion occupies a sensitive government position.  *See, e.g., United States v. Stephenson*, 895 F.2d 867, 877-78 (2d Cir. 1990) (affirming denial of sensitive position finding where employee's discretion was minor and lower-level).  When the discretion includes some final decision-making authority or involves substantial responsibility for funds, however, the position can qualify under the Guidelines. *United States v. Matzkin*, 14 F.3d 1014, 1021 (4th Cir. 1994) (affirming finding of sensitive position for Department of Navy employee who exercised considerable discretion in contract awards and supervised other employees); *United States v. Lazarre*, 14 F.3d 580, 582 (11th Cir. 1994) (affirming finding of sensitive position for INS employee who held discretion over parole decisions

44

regarding Haitian detainees).

Tomblin contends that, as a mere aide, Mauldin did not possess the level of discretion or responsibility necessary to warrant the application of the upward departure. We disagree. A senator's top administrative aide holds a position of substantial influence, because he often serves as the senator's functional equivalent. *See Gravel v. United States*, 408 U.S. 606, 616-17, 92 S. Ct. 2614, 2623, 33 L. Ed. 2d 583 (1972) ("[I]t is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants; . . . the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos . . . ."). Moreover, Meyer testified that Mauldin's presence at a meeting signified Hecht's direct interest in the outcome. Consequently, the district court did not err in granting an eight-level upward departure in sentencing Tomblin.

### III

For the foregoing reasons, we VACATE Tomblin's conviction for extortion (Count 3), VACATE his sentence on the extortion count, REMAND for new trial on that count only, and we AFFIRM Tomblin's convictions on all remaining counts.[60]

---

[60] Because Tomblin received the same sentence on all counts to run concurrently, our vacating his extortion conviction and sentence does not impact his sentence on the remaining counts.